*This opinion is subject to revision before final*
*Publication in the Pacific Reporter*

**2015 UT 5**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

SHANNON JESS ASHCRAFT,
*Appellant.*

No. 20120306
Filed January 23, 2015

Third District, Salt Lake
The Honorable Denise P. Lindberg
No. 111906162

Attorneys:

Sean D. Reyes, Att'y Gen., Brian L. Tarbet, Jeffrey S. Gray,
Michelle M. Young, Asst. Att'ys Gen.,
Salt Lake City, for appellee

Joanna E. Landau, Kerri S. Priano, Salt Lake City, for appellant

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and JUSTICE DURHAM joined.

JUSTICE PARRISH authored a dissent, in which
ASSOCIATE CHIEF JUSTICE NEHRING joined.

JUSTICE LEE, opinion of the Court:

¶1  Shannon Ashcraft appeals his convictions of possession of a controlled substance with intent to distribute, unlawful possession of a dangerous weapon, and possession of drug paraphernalia. Ashcraft asserts that there was insufficient evidence to establish his possession of the contraband and, alternatively, that his conviction should be reversed on the basis of prosecutorial misconduct at trial. We disagree on both counts and accordingly affirm.

I

¶2    In August 2011, Sergeant Huggard, a Murray City police officer, was patrolling a motel parking lot known for frequent drug activity.[1] One night, Huggard observed a tan Ford Ranger truck with a distinctive black panel driving through the parking lot. From the license plates, Huggard determined that the truck belonged to a man named Justin Sorenson. Huggard also discovered that Sorenson had several outstanding warrants and a suspended driver's license, and learned that he had been a suspect in a previous drug investigation.

¶3    Later, in the early morning hours, Huggard saw the truck again. The truck had a male driver and a female passenger. The driver pulled the truck into the motel lot, and both the driver and the passenger went into a motel room.

¶4    The next night, Huggard returned to the area to patrol again. He saw the tan truck again, with the same male driver and female passenger. He began to follow the truck but did not signal or otherwise direct the driver to stop. After a while, the driver pulled over on his own accord and waited for Huggard to approach. Huggard asked the driver whether he was Sorenson. The driver answered in the negative. He then identified himself as Shannon Ashcraft; explained that he had borrowed the truck from Sorenson, who was in the hospital; and admitted that he did not have a valid driver's license.

¶5    As for the passenger, she identified herself as April Chavez. Chavez also indicated that she did not have a valid license. Because neither Ashcraft nor Chavez was licensed to drive the truck, Huggard began impoundment proceedings and called for backup, as well as a K9 unit.

---

[1] When reviewing a sufficiency of the evidence claim, we must take the "evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645 (internal quotation marks omitted). Thus, although Ashcraft disagrees with these factual circumstances in some respects, and in particular the deductions to be made from them, we recite the version of the events supporting the jury's verdict.

¶6    During the impound process, Huggard asked Ashcraft and Chavez to exit the truck. As Chavez exited, a large, open bottle of alcohol fell from her lap. At that point, Huggard asked Ashcraft and Chavez if they consented to be searched for drugs and weapons. Both agreed. During the search, Ashcraft appeared "very nervous" and was "fidgeting around a lot." Huggard "had a difficult time getting any kind of eye contact" with him. In the course of the search, Huggard discovered that Ashcraft was carrying a pocketknife with a "brownish/black tar substance" on the blade. He also found that Ashcraft was carrying a wallet containing $793 in cash. Huggard did not find drugs or weapons when searching Chavez. After the search, Huggard allowed Chavez to take her belongings and leave.

¶7    Next, Huggard performed an inventory search of the vehicle pursuant to the impound. In the bed of the truck, tucked between the edge of the truck bed and a spare tire on the driver's side, Huggard found a green zippered bag. He also noted that the rear window between the cab and bed was open. Huggard asked Ashcraft to identify the owner of the bag. Ashcraft responded that he didn't know whose bag it was, and indicated—before the bag was opened—that Huggard "must have put the bag there." Inside the bag, Huggard found thirty to forty baggies, some containing a "white crystal-like substance" and some containing a "brown caked tar[-]like substance," several bottles of pills, two digital scales, three glass pipes with white residue on them, other drug paraphernalia, and a pink stun gun with a charger.

¶8    None of the contraband found in the bag was tested for fingerprints. And none of the substances in the bags, in the pill bottles, or on the blade of Ashcraft's pocketknife were conclusively identified through laboratory testing. Also, the K9 unit's detection dog apparently did not alert on a sweep of the truck. Yet Huggard himself identified all of the substances in question, based on his experience over several years as a narcotics officer.

¶9    Huggard testified that the "brown caked tar[-]like substance" on the blade of the knife and in some of the baggies was consistent with heroin, based on the look and smell of the substance. He also testified that he confirmed this conclusion by performing a test using a field test kit, which generated a positive result for an opiate. And he identified the "white crystal-like substance" in the other baggies as consistent with methamphetamine,

a conclusion that was also consistent with a positive result from a field test kit. As for the pills in the bottles, Huggard identified them as hydrocodone, oxycodone, Alprazolam, and Clonazepam. He did so by observing the markings on the pills and comparing them visually to pills in a "drug bible."

¶10 Ashcraft was arrested and charged with six counts of possession of a controlled substance with an intent to distribute, two counts of unlawful possession of a dangerous weapon, one count of possession of drug paraphernalia, driving on a suspended license, possession of an open container of alcohol in a vehicle, and failure to signal. Because he was not in direct control of the contraband at the time of his arrest, Ashcraft's possession charges were prosecuted under a constructive possession theory, under which the jury was asked to draw an inference based on circumstantial evidence connecting him with the contraband. *See State v. Fox*, 709 P.2d 316, 318–19 (Utah 1985) (explaining the theory of constructive possession).

¶11 At trial, the defense spent a significant amount of time highlighting the potential room for reasonable doubt in the State's case against Ashcraft. During Huggard's cross examination, defense counsel elicited testimony that he originally thought the driver of the truck was Sorenson, that K9 dogs on the scene had not alerted on the truck, that no fingerprints were collected, that the drugs were not identified in a lab, that Chavez was also in the car with Ashcraft, and that the pink stun gun was of the type that is often marketed to women.

¶12 During closing arguments, Ashcraft's counsel urged the jury to avoid "preconceived notions" about Ashcraft. Counsel also went on to suggest that Sergeant Huggard had harbored "preconceived notions" against Ashcraft, as evidenced by his "speculating" that the man driving the truck was Sorenson. And the defense suggested that Huggard's preconceived notions had affected his "ability to perceive the circumstances."

¶13 In response to the notion that Huggard "had it out to get Mr. Ashcraft," the prosecutor asserted in closing that Huggard had "no ax to grind" and had "nothing to gain by that, neither does any police officer." Counsel also proceeded to assert that "[i]f a police officer were to make up stuff or do something like

that, that's their career on the line," and that "Sergeant Huggard has nothing to gain by bringing in preconceived notions."

¶14 Later in the prosecutor's closing argument, he argued that the cash in Ashcraft's wallet should lead the jury to infer that he was in the business of selling the drugs found in the truck. The prosecutor asserted that he usually had only about ten dollars in his wallet at a time, as well as a debit card, "so for me to have $800 would be out of the ordinary." He then stated "I would submit that that's probably normal for most people, but I leave that to your personal experience."

¶15 The prosecutor also summed up the circumstantial evidence as a whole and argued that the jury should infer that Ashcraft was in possession of the contraband:

> Given that we had the nexus between the knife, having heroin, the bag having heroin, his activities, the amount of cash he had on him the amount of the pills that were in the bag, the State proceeded on what we had. And I would submit to you that [the] State has proven beyond a reasonable doubt that the defendant possessed these drugs with the intent to distribute them.

¶16 The jury convicted Ashcraft on all charges. He now appeals his convictions of possession of a controlled substance with intent to distribute, possession of drug paraphernalia, and possession of a dangerous weapon.[2]

II

¶17 Ashcraft's principal argument on appeal is a challenge to the sufficiency of the evidence to establish constructive possession. Alternatively, Ashcraft also challenges his convictions on the basis of alleged prosecutorial misconduct. We reject both sets of arguments and affirm.

---

[2] Ashcraft does not appeal his convictions for driving on a suspended license, having an open container in a vehicle, and failure to signal.

A

¶18 On a sufficiency of the evidence claim we give substantial deference to the jury. We "review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict." *State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (internal quotation marks omitted). Inferences may reasonably be drawn from circumstantial evidence. *Id.* ¶ 47. And a jury's inference is reasonable "unless it falls to a level of inconsistency or incredibility that no reasonable jury could accept." *State v. Maughan*, 2013 UT 37, ¶ 14, 305 P.3d 1058 (internal quotation marks omitted).

¶19 For possession charges, the circumstantial evidence necessary to convict is evidence showing a "sufficient nexus between the accused and the [contraband] to permit an inference that the accused had both the power and the intent to exercise dominion and control over the [contraband]." *State v. Fox*, 709 P.2d 316, 319 (Utah 1985). The analysis of the evidence under this standard depends "upon the facts and circumstances of each case." *Id.* Yet our cases have identified some relevant considerations that a jury may consider. Those factors include "ownership and/or occupancy of the residence or vehicle", presence of the defendant when the contraband is discovered, the defendant's proximity to the contraband, previous drug use by the defendant (if the contraband is drug-related), incriminating statements or behavior, and presence of contraband in a specific area where the defendant had control. *State v. Workman*, 2005 UT 66, ¶ 32, 122 P.3d 639.

¶20 This is not an exhaustive list, and some factors may not be pertinent in all cases. *Id.* Certain factors, moreover, may be insufficient by themselves to establish possession as a matter of law. Ownership or occupancy of the premises where contraband is discovered, for example, may not be enough to show constructive possession by itself. *Fox*, 709 P.2d at 319.[3] That said, it is a rare

---

[3] This rule is a sensible one as far as it goes; if the *only* connection between a defendant and the contraband is bare title or mere occupancy of the area in which it is found, there may be substantial room for reasonable doubt as to whether the contraband belongs to the defendant. Such doubt may be especially substantial where other people with access to the area could have placed the

case where the defendant's ownership or occupancy is truly the sole nexus with the contraband. In cases where there is additional evidence, including circumstantial evidence, that strengthens the nexus between ownership or occupancy and the contraband, the jury may consider those circumstances in drawing an inference of possession.[4]

¶21 Ashcraft asserts that the only connection between him and the green bag was his occupancy of the truck. And he accordingly insists that the evidence is insufficient as a matter of law. We disagree. Here there is more than just evidence of occupancy of the vehicle. Several other considerations suggest a connection between Ashcraft and the green bag, and those considerations, taken together, establish a reasonable basis for a conclusion that Ashcraft was in possession of the contraband.[5] Ashcraft repeatedly

---

contraband in the home or vehicle without the owner's knowledge, and thus the owner would have no "power and intent to exercise dominion and control" over it. *State v. Fox*, 709 P.2d 316, 320 (Utah 1985). But the general principle is hardly a hard-and-fast rule, and this case falls outside it for reasons noted here.

[4] *See, e.g.*, *State v. Workman*, 2005 UT 66, ¶ 34 122 P.3d 639 (defendant who co-occupied an apartment with a meth lab also had belongings intermingled with lab equipment, a history of methamphetamine use, purchased some containers and glassware used in the lab, and left a fingerprint on one of the containers); *State v. Hansen*, 732 P.2d 127, 132 (Utah 1987) (defendant argued his only connection to marijuana was co-occupancy of an apartment, but he possessed drug paraphernalia, the drugs were found in a locked box in his room under his clothing, and he possessed the key to the box); *Fox*, 709 P.2d at 320 (evidence of ownership of a home plus several large greenhouses of marijuana constructed in close proximity to the home, ownership of other drug paraphernalia and instruction books for growing marijuana, and marijuana in such a large volume it was reasonable to conclude it must have been grown for distribution).

[5] The dissent's contrary conclusion is based in part on a misreading of our opinion. We do not conclude that "anyone who has the misfortune of occupying a vehicle in which illegal drugs are found is subject to conviction." *Infra* ¶ 41. Our analysis is more

drove through an area known for drug activity during late night and early morning hours, while carrying a large amount of cash. The bag was in close enough proximity that Ashcraft could have reached through the open window and touched it from the driver's seat. Ashcraft accused the arresting officer of planting the bag in the truck *immediately* upon being asked about it—and before it had been opened. And a substance, identified as heroin by the arresting officer, was found on the blade of the pocketknife he was carrying.

¶22 Each of these pieces of evidence would, taken on its own, be a slim basis for inferring possession. And each piece of evidence could have an innocent explanation. But cumulatively this evidence is sufficient to sustain a reasonable jury verdict. A reasonable jury could conclude from this evidence that there was a sufficient nexus between the bag and Ashcraft to establish the element of constructive possession. *See Workman*, 2005 UT 66, ¶ 35 (although individual factors "[t]aken alone" may be unlikely "to establish a sufficient nexus," the "cumulative effect" of such factors may be "such that a reasonable jury could have concluded that there was a sufficient nexus" to establish constructive possession).

¶23 The dissent second-guesses the inferences adopted by the jury on individual pieces of evidence, while also declining to defer to the jury's assessment of the cumulative effect of the evidence as

---

nuanced; it is based on our sense of the cumulative effect of the evidence presented to the jury, and on our conclusion that a reasonable jury could find constructive possession under these circumstances. It is one thing to disagree with that conclusion—to assert that the evidence raises "serious questions" as to whether Ashcraft "exercised dominion and control" over the green bag. *Infra* ¶ 46. It is misleading, however, to assert that the court has adopted a legal rule that requires a finding of constructive possession in any case in which the defendant is "in non-exclusive proximity to illegal drugs or paraphernalia." *Infra* ¶ 41 (insisting that that "cannot be the law"); *see also infra* ¶ 47 (asserting that "there is no practical limit to the concept of constructive possession when applied to someone in non-exclusive proximity to illegal drugs or paraphernalia"). That is not the basis of our holding.

a whole. Specifically, the dissent dismisses any inference from Ashcraft's "late-night presence in an area known for drug activity with a large amount of cash" as "speculative," *infra* ¶ 48; posits an alternative explanation for Ashcraft's incriminating accusation that the arresting officer had "planted" the bag, *infra* ¶ 49; and concludes that "it is mere speculation to assume that the contraband found in the green bag belonged to Mr. Ashcraft simply because he had a knife that contained a suspect residue." *Infra* ¶ 50.

¶24 These are fair arguments for counsel to present to the jury in closing. But our review on appeal is different. The question presented is not whether we can conceive of alternative (innocent) inferences to draw from individual pieces of evidence, or even whether we would have reached the verdict embraced by the jury. It is simply whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict. We affirm on that basis.

¶25 We also reject a number of the dissent's arguments on their own terms. First, Ashcraft's incriminating statement need not "necessarily suggest" a connection to the bag to support the jury's verdict. *Infra* ¶ 49. And the fact that we can identify an "equally" plausible alternative inference is not nearly enough to set that verdict aside. *Infra* ¶ 49. The inference to be drawn from the evidence was the jury's to make (within reason), and the inference it apparently drew was reasonable—more so, in fact, than the notion that Ashcraft may have accused the officer of planting the bag because he knew the contents of the bag, knew it "belonged to Ms. Chavez or Mr. Sorenson," and "intended to distance himself from it because he was aware of its contents." *Infra* ¶ 49. Accusing a police officer of planting evidence is a brash move. If Ashcraft knew that the bag contained contraband but wasn't its owner, surely he would have simply disclaimed ownership instead of accusing a police officer. At least that's the way the jury seems to have seen the matter, on a point meriting our deference on appeal.[6]

---

[6] The dissent also seeks to diminish the significance of this inference on the ground that "Ashcraft's allegedly incriminating statement is different from the statements on which we have relied in other cases where incriminating behavior or statements

¶26 Second, there was more than "mere speculation" linking the substance on Ashcraft's knife to the "contraband found in the green bag." *Infra* ¶ 50. Officer Huggard testified, based on his experience and results of field tests, that the "brown caked tar[-]like powdery substance" on the blade of the knife and in some of the baggies in the green bag was consistent with heroin. So, despite the dissent's insistence to the contrary, there *was* "evidence that the substance on the knife was the same as the illicit substance in the green bag." *Infra* ¶ 50. And the evidence regarding Ashcraft's knife is accordingly supportive of the jury's determination of constructive possession.

¶27 This and other evidence in the case could be suspect if taken in isolation. But in light of the totality of the evidence taken as a whole, we conclude that there was sufficient evidence to sustain a verdict based on a determination of constructive possession. And in light of that evidence, we find it unnecessary to eliminate other reasonable inferences to be drawn from the evidence—such as the notion that Ashcraft may have had an innocent reason to be in an area known for drug activity with a large amount of cash late at night, *infra* ¶ 48, or that Chavez or Sorenson could have been the owner or possessor of the green bag, *infra* ¶ 51. The question presented is not whether some other (innocent) inference might have been reasonable. It is simply whether the inference adopted by the jury was sustainable. We conclude that it was and affirm on that basis.

¶28 In so doing, we acknowledge the lack of direct, forensic evidence tying Ashcraft to the contraband in question. As the dissent indicates, the record is devoid of fingerprint evidence tying Ashcraft to the contraband, of any of Ashcraft's "personal

---

gave rise to an inference of constructive possession." *Infra* ¶ 49 (citing cases from other jurisdictions crediting incriminating statements of defendants accused of constructive possession). But the cited cases are not ours, and in any event they do not purport to establish any sort of floor or minimum basis for crediting a defendant's statement as incriminating. That is a question of fact, not law. And it is a question on which the jury is entitled to deference in the context of the evidence as a whole in this case, and not by comparison to the record in other cases.

items . . . intermingled with the items found in the green bag," or of "drugs on defendant's person" (other than the heroin residue on his knife). *Infra* ¶ 53. And it is certainly true that the results of further investigation might have weakened the prosecution's case. But it might also have strengthened it. And in any event those speculative prospects have nothing to do with the question before us. A reviewing court is not to measure the sufficiency of the evidence against a hypothetical—CSI-based—investigative ideal. Instead of imagining the evidence that *might have been* presented, we consider the evidence that *was* presented, and evaluate its sufficiency through a lens that gives the jury's verdict the benefit of all reasonable inferences. We find the evidence sufficient, and not undermined by speculation about further investigation that might have taken place.[7]

¶29 Ashcraft is also right to note that the evidence could alternatively have supported a determination that the contraband was connected to Sorenson and/or to Chavez. But that is likewise insufficient to undermine our confidence in the verdict. The alleged connection to alternative suspects was a fruitful source of cross-examination and argument to the jury. And as noted above, defense counsel in fact availed herself of this line of argument. Yet the jury was by no means compelled to accept the existence of reasonable doubt posited by the defense's finger-pointing, and in fact it did not accept the argument.

¶30 For all of these reasons, the jury made a reasonable inference that Ashcraft was in constructive possession of the green bag. We cannot disturb the jury's conclusion just because it *could have* reasonably come to a different one.

---

[7] The dissent concedes that our role is not to imagine "the evidence that might have been presented." *Infra* ¶ 53. But it then proceeds to insist that it is still somehow "helpful to identify the lacking evidence that may have supported a finding of constructive possession." *Infra* ¶ 53. We see no benefit to that imaginative comparison. The question presented is not how this prosecution stacks up against a hypothetical ideal. It is simply to evaluate the evidence that was presented, against a deferential standard of review yielding the benefit of the doubt to the jury's verdict.

B

¶31 Matters not in evidence cannot be properly considered by the jury. It is misconduct for the prosecutor to refer to such matters. *See State v. Hopkins*, 782 P.2d 475, 478 (Utah 1989). To sustain a reversal on an assertion of prosecutorial misconduct, a defendant must establish both that the prosecutor's conduct "call[ed] to the attention of the jurors matters they would not be justified in considering in determining their verdict and, under the circumstances of the particular case, the error is substantial and prejudicial." *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987).

¶32 Ashcraft cites three instances of alleged misconduct in the prosecutor's closing argument. He asserts, specifically, that the prosecutor improperly vouched for the credibility of Huggard's testimony; that he vouched for the credibility of the evidence; and that he vouched for the strength of the State's case as a whole. And on each point Ashcraft asserts that the prosecution made reference to material not in the record.

¶33 A threshold question concerns preservation. The State urges us to decline to reach the merits of Ashcraft's claims on the ground that he failed to preserve a specific objection to each of the foregoing instances of alleged "vouching." Upon review of the record we agree that there was no specific articulation of a basis for objecting to the prosecution's statements—only a general objection (without a basis or explanation) at the first mention of the notion that Huggard had "nothing to gain by bringing in preconceived notions." But we nonetheless proceed to the merits on the basis of an exception to the general requirement of preservation. We hold, specifically, that it would have been futile for Ashcraft to have preserved a specific objection in the district court, and on that basis we excuse him from his failure to do so.[8]

---

[8] *See Roundy v. Staley*, 1999 UT App 229, ¶ 6, 984 P.2d 404 (failure to preserve evidentiary objection excused where district court unequivocally stated that videotape evidence would be admitted, making "further objection to the admission of [the evidence] . . . futile"); *People ex rel. Klaeren v. Vill. of Lisle*, 781 N.E.2d 223, 231 (Ill. 2002) ("[T]here is no need to object when it is apparent that an objection would be futile."); *Staubes v. City of Folly Beach*, 529 S.E.2d 543, 547 (S.C. 2000) ("This Court does not require parties to

¶34 The basis for our determination of futility is this: After defense counsel asserted an initial, general objection to the prosecution's assertion that Huggard had "nothing to gain by bringing in preconceived notions," the district court interrupted and directed the prosecution to "go ahead," admonishing defense counsel with the assertion that "this is argument and you were given the benefit of … silence." Under the circumstances and given the timing, tone, context, and content of the district court's response, we deem it reasonable for defense counsel to have viewed this response as an indication of the court's unwillingness to hear any further objection or explanation. And we accordingly deem such further objection or explanation sufficiently futile to excuse Ashcraft's failure to preserve a specific objection.[9]

¶35 That determination requires us to proceed to the merits of Aschraft's claims of prosecutorial misconduct. Initially, we acknowledge the impropriety of a prosecutor's "bolster[ing] a witness by vouching for his credibility." *State v. Carter*, 776 P.2d 886, 892 (Utah 1989) (internal quotation marks omitted). Such vouching is improper because it invites the jury to rely on matters outside the record. Yet the matter of *vouching* is not just inviting the jury to credit the testimony of the state's witness. That is standard operating procedure, and hardly misconduct. *Impermissible vouching*, on the other hand, occurs when the prosecution "place[s] the prestige of the government behind the witness by making explicit personal assurances of the witness' credibility," or

---

engage in futile actions in order to preserve issues for appellate review.");.

[9] In so holding, we do not mean to suggest that further objection would always be futile any time a trial judge overrules an objection in a manner cutting off the opportunity for further explanation. The question of futility is highly context-dependent and case-specific—turning not just on the trial court's decision but on its timing, tone, and content. Here our decision is based not only on the nature and timing of the district court's decision but on the tone of the admonition that followed it, which seemed to suggest that further objections would not be tolerated to the extent they would deprive the prosecution of the "benefit of . . . silence" that was afforded to the defense.

"implicitly . . . indicat[es] that information not presented to the jury supports the testimony." *Id.* (internal quotation marks omitted).

¶36 Under this framework, the prosecutor's statements about Huggard did not amount to impermissible vouching. First, the prosecutor made no explicit statement that he *personally* knew Huggard to be truthful. He did not ask the jury to take his word for it that Huggard was a credible witness. Such an argument would call the jury's attention to matters it is not "justified in considering in determining their verdict"—the prosecutor's *personal opinion* of a witness. Instead, the prosecutor, in direct response to defense counsel's argument that Huggard's perception of the events was undermined by "preconceived notions," urged the jury to view that argument skeptically. He did so by arguing that there was no reason to believe that Huggard or any officer would have had "preconceived notions" against suspects, and highlighted the lack of evidence showing that Huggard had an "ax to grind" against Ashcraft in particular.

¶37 Second, the prosecutor did not imply that he knew more about Huggard than the jurors did, or implore them to take such information into consideration in evaluating Huggard's testimony. Instead, this was a matter of *both* the prosecution and the defense urging the jury to evaluate the officer's credibility based on their own understanding of incentives generally facing the police—with the defense insisting that Huggard may have harbored "preconceived notions" against Ashcraft and asserting that such notions may have affected his "ability to perceive the circumstances," and the prosecution responding with the suggestion that an officer's "career [could be] on the line" if he "were to make up stuff or do something like that." This was not vouching through an allusion to information known to the prosecution but not in the record. It was an instance of both the defense and the prosecution seeking to urge the jury to assess the officer's credibility in a manner consistent with their respective positions—and in accordance with common-sense incentives and reasonable inferences generally known to the jury. That is permissible—and not at all a matter of vouching. *See State v. Bakalov*, 1999 UT 45, ¶ 59, 979 P.2d 799 (prosecution may "fully discuss with the jury reasonable inferences and deductions drawn from the evidence"); *Delacruz v. State*, 10 P.3d 1131, 1132–33 (Wyo. 2000) (holding it was not prose-

cutorial misconduct to refer to the background of witnesses and argue that "[y]our common sense will tell you that . . . they have no reason to come into this courtroom and orchestrate a lie," because the prosecutor was "simply asking the jury to apply common sense to the evidence it had heard").

¶38 For the same reason, it was permissible for the prosecutor to discuss the potential conclusions to be drawn from the cash in Ashcraft's wallet. The cash in Ashcraft's wallet may be subject to a reasonable inference that it was a result of drug activity—or, alternatively, a contrary inference that it was there for an innocent reason. But as it was up to the jury to make that inference, it was acceptable for the prosecutor to discuss the matter, and to urge the jury to make an inference in the prosecution's favor. *Bakalov*, 1999 UT 45, ¶ 59. The prosecutor may have gone too far when he pressed this inference in terms of his own personal experience. But even if the comment about his own practices for carrying cash crossed a line, that comment was harmless, as the prosecutor immediately instructed the jury to rely on their own experience and not his own. *State v. Pearson*, 943 P.2d 1347, 1352–53 (Utah 1997) (holding that it was improper for a prosecutor to "offer[] a factual assertion based on his own experience" but that the statement was not reversible prosecutorial misconduct because he "made no effort to hold himself out as an expert, and he addressed matters that are within the general realm of human experience and common sense").

¶39 Finally, there was no prosecutorial misconduct in the prosecution's summary of the evidence and ultimate insistence that the State had proven Ashcraft's guilt beyond a reasonable doubt. This was nothing more than a summary assertion of the prosecution's quintessential position in closing argument. Such assertion did not venture into the forbidden territory of calling upon the jury to "trust the Government's judgment rather than [the jury's] own view of the evidence." *State v. Hopkins*, 782 P.2d 475, 480 (Utah 1989) (quoting *United States v. Young*, 470 U.S. 1, 18–19 (1985)). The prosecutor did not ask the jurors to defer to the state's judgment over their own. He simply summarized his position and the evidence supporting it and then asked the jury to enter a conviction. Such a statement is as commonplace as it is innocuous in closing argument—a matter well within the realm of appropriate prosecutorial conduct.

JUSTICE PARRISH, dissenting:

## III

¶40 We affirm on the above grounds. We deem the evidence presented to the jury to be sufficient to sustain a reasonable inference of Ashcraft's constructive possession. And we find no basis for a determination of prosecutorial misconduct.

――――――

JUSTICE PARRISH, dissenting:

¶41 I cannot join the court in affirming Mr. Ashcraft's conviction because the evidence is insufficient to establish that Mr. Ashcraft constructively possessed the drugs and paraphernalia found in Mr. Sorenson's truck. Under the court's reasoning, anyone who has the misfortune of occupying a vehicle in which illegal drugs are found is subject to conviction. That cannot be the law.

¶42 We "overturn a conviction for insufficient evidence when . . . the evidence is insufficient to prove each element of the crime beyond a reasonable doubt." *State v. Fox*, 709 P.2d 316, 318 (Utah 1985). Although we review the evidence "in the light most favorable to the verdict," *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645, we must overturn a conviction when "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Holgate*, 2000 UT 74, ¶ 18, 10 P.3d 346 (internal quotation marks omitted).

¶43 Because the evidence presented fails to establish a nexus between Mr. Ashcraft and the drugs and paraphernalia found in the green bag, I believe that a reasonable juror necessarily would have harbored some reasonable doubt as to Mr. Ashcraft's guilt. Accordingly, I would reverse his conviction.

¶44 Mr. Ashcraft was convicted of possessing a controlled substance with intent to distribute. *See* UTAH CODE § 58-37-8(1)(a)(iii). The State prosecuted Mr. Ashcraft on a theory of constructive possession, which requires a "sufficient nexus between the accused and the drug [or paraphernalia] to permit an inference that the accused had both the power and the intent to exercise dominion and control over the drug [or paraphernalia]." *State v. Layman*, 1999 UT 79, ¶ 13, 985 P.2d 911 (alterations in original) (inter

nal quotation marks omitted). But mere proximity to the drugs or paraphernalia, without additional evidence of control and dominion, is insufficient to establish possession, especially when proximity is not exclusive. *See Fox*, 709 P.2d at 319.

¶45 The truck in which the contraband was found belonged to Mr. Sorenson. Indeed, Sergeant Huggard initially believed he was following and pulling over Mr. Sorenson. Sgt. Huggard learned Mr. Ashcraft was the driver only after pulling him over. At that time, the truck was also occupied by Ms. Chavez, who was sitting in the passenger seat. While following the truck and pulling Mr. Ashcraft over, Sgt. Huggard neither saw anyone place an item in the truck's bed nor put their hands out of the truck's back window. And it is inherently improbable that Mr. Ashcraft could have put his right-hand through the cab window to hide an item on the far-left side of the truck bed while maintaining control of the vehicle and avoiding detection by Sgt. Huggard.

¶46 During the initial search of the truck, Sgt. Huggard did not find any drugs or paraphernalia. Later, when the green bag was found, the contraband was tucked so far out of sight and was so inaccessible that a K-9 officer and dog did not detect it. The green bag contained a pink stun gun. Although Ms. Chavez had easier access to the green bag than Mr. Ashcraft, she was allowed to leave. Finally, despite the fact that three people had access to the green bag, the police did not conduct any forensic testing of the physical evidence. These facts raise serious questions as to whether Mr. Ashcraft had any knowledge of the green bag's existence, and even more serious questions about whether he exercised dominion and control of it.

¶47 The majority acknowledges that there is no evidence directly linking Mr. Ashcraft to the illicit drugs. It instead relies on three inferences to create the necessary nexus. These are Mr. Ashcraft's presence in an area known for drug activity while carrying a large amount of cash, Mr. Ashcraft's allegedly incriminating statement to the police, and Mr. Ashcraft's possession of a knife with a brown substance on it. But if these inferences are sufficient to support a conviction based on constructive possession, there is no practical limit to the concept of constructive possession when

JUSTICE PARRISH, dissenting:

applied to someone in nonexclusive proximity to illegal drugs or paraphernalia.

¶48 Mr. Ashcraft's late-night presence in an area known for drug activity with a large amount of cash creates no nexus between him and the items in the green bag. Instead, it raises only a speculative possibility of Mr. Ashcraft's intent to distribute drugs. And Ms. Chavez was seen in the truck both nights, while Mr. Ashcraft may have been driving the truck on only the second night. In short, Mr. Ashcraft's late-night presence in a questionable neighborhood when the other possible possessors were also present cannot give rise to the inference that the drugs belonged to Mr. Ashcraft.

¶49 The court construes Mr. Ashcraft's accusation that the arresting officer planted the green bag "*immediately* upon being asked about it" as an incriminating statement. *Supra* ¶ 21. But this statement is consistent with Mr. Ashcraft's other statements disclaiming ownership of the bag and does not necessarily suggest a knowledge of its contents. Indeed, it is equally consistent with the possibility that the bag in fact belonged to Ms. Chavez or Mr. Sorenson and that Mr. Ashcraft intended to distance himself from it because he suspected its contents. Mr. Ashcraft's allegedly incriminating statement is much different from the statements on which we have relied in other cases where incriminating behavior or statements gave rise to an inference of constructive possession. *Fox*, 709 P.2d at 319 (citing *United States v. Garcia*, 655 F.2d 59, 62 (5th Cir. 1981) (noting that defendant nodded affirmatively when introduced as owner of cocaine); *Francis v. State*, 410 So. 2d 469, 471 (Ala. Crim. App. 1982) (noting that the defendant slammed a door in the face of police and yelled, "throw it in the fire"); *Allen v. State*, 282 S.E.2d 126, 127 (Ga. Ct. App. 1981) (noting that the defendant told an unnamed individual that the defendant had $500 worth of marijuana)).

¶50 The brown substance on Mr. Ashcraft's knife is similarly insufficient to link him to the green bag. Even if the substance were an opiate-derivative, it is mere speculation to assume that the contraband found in the green bag belonged to Mr. Ashcraft simply because he had a knife that contained a suspect residue. And such speculation is insufficient to overcome reasonable doubt as to the ownership of the green bag. In my view, no nexus

between the knife and green bag could be drawn absent some evidence that the substance on the knife was the same as the illicit substance in the green bag. But the State presented no such evidence. While the State may have charged Mr. Ashcraft with possession of drug paraphernalia based on the substance on the knife, the knife itself is not evidence that Mr. Ashcraft committed the separate crime of possessing the green bag. Without some evidence linking Mr. Ashcraft to the drugs, it is a fallacy to infer that he possessed and intended to distribute drugs just because he was driving a borrowed truck in a questionable neighborhood late at night, carrying cash.

¶51 Mr. Ashcraft shared possession of the vehicle with two other individuals. Accordingly, in order to support a verdict of guilt, the inferences relied on by the State must either exclude the other individuals as possible possessors or point to Mr. Ashcraft as the possessor of the contraband. *See Fox*, 709 P.2d at 320 ("[E]vidence supporting the theory of 'constructive possession' must raise a reasonable inference that the defendant was engaged in a criminal enterprise and not simply a bystander."); *State v. Salas*, 820 P.2d 1386, 1388 (Utah Ct. App. 1991) ("In order to find that the accused was in possession of drugs found in an automobile he was not the sole occupant of, and did not have sole access to, there must be other evidence to buttress such an inference."). Without evidence creating a nexus between Mr. Ashcraft and the drugs, or excluding the other two possible possessors, Mr. Ashcraft may be serving a sentence for the criminal activity of others.

¶52 I acknowledge that the evidence presented at trial may have been sufficient to sustain a conviction if Mr. Ashcraft had exclusive possession of the vehicle. But he did not. The vehicle was actually owned by and registered to Mr. Sorenson, a suspected drug dealer. And the State did not dispute that Mr. Ashcraft had borrowed the truck when Mr. Sorenson was hospitalized. While the contraband was theoretically within reach of Mr. Ashcraft, the officer did not see him reach into the back of the truck. More importantly, the contraband was also in reach of Ms. Chavez, but the police did not bother to question or search her. *See Salas*, 820 P.2d at 1388 (acknowledging that drugs found where a passenger had been sitting "renders the remaining evidence sufficiently inconclusive as to whether defendant knew of

JUSTICE PARRISH, dissenting:

the presence of the cocaine"). In short, the evidence does not link Mr. Ashcraft with the contents of the green bag, nor does it exclude Mr. Sorenson or Ms. Chavez as the owner. In my view, the inferences on which the majority relies are simply insufficient to establish beyond a reasonable doubt that Mr. Ashcraft exercised dominion and control over the green bag.

¶53 The State's failure to offer any direct evidence linking Mr. Ashcraft to the green bag also speaks volumes. Although I agree with the court that we must not "imagin[e] the evidence that might have been presented," *supra* ¶ 28 (emphasis omitted), it is nonetheless helpful to identify the lacking evidence that may have supported a finding of constructive possession. Here, the State did not present any evidence "linking or tending to link" Mr. Ashcraft with the drugs, including, "sale of drugs, use of drugs, . . . drugs in plain view, and drugs on defendant's person." *Salas*, 820 P.2d at 1388. His personal items were not intermingled with the items found in the green bag. *See State v. Workman*, 2005 UT 66, ¶ 34, 122 P.3d 639. And the State presented "no forensic evidence tying" Mr. Ashcraft to the green bag, such as fingerprints or drug-testing of the knife and heroin inside the green bag. *See State v. Gonzalez-Camargo*, 2012 UT App 366, ¶ 24, 293 P.3d 1121. Finally, the State made no attempt to determine whether Ms. Chavez was the owner of the green bag.

¶54 In my view, this case rests exclusively on Mr. Ashcraft's proximity to drugs; the inferences on which the State relies are insufficient to give rise to the inference that Mr. Ashcraft constructively possessed the green bag. Accordingly, I would reverse his conviction.