2019 UT App 158

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSEPH CRESCENCIO GRANADOS,
Appellant.

Opinion
No. 20180055-CA
Filed September 26, 2019

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 161906242

Nathalie S. Skibine, Nick Falcone, and Sherry Valdez,
Attorneys for Appellant

Sean D. Reyes and Lindsey L. Wheeler, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1 Joseph Crescencio Granados appeals his convictions arising from events surrounding a shooting and a subsequent police chase. A jury convicted Granados on all charges filed against him based on those events. On appeal, Granados challenges the sufficiency of the evidence supporting the convictions specifically related to the shooting: attempted murder, possession of a dangerous weapon by a restricted person, and criminal mischief. In addition, during the trial the district court disqualified one of the jurors (Juror 16) for sleeping. Granados argues that the court violated rule 17(g) of the Utah Rules of Criminal Procedure by replacing Juror 16, over

counsel's objection and without questioning her. We affirm, concluding that the evidence was sufficient to support the jury's verdict related to the shooting and that the district court did not violate rule 17(g) by disqualifying Juror 16 without first questioning her.

BACKGROUND[1]

*The Shooting*

¶2 One afternoon, as the victim (Victim) drove home from work, he noticed a "maroon" Chevy Malibu (Malibu) ahead of him "swerving all over the place." From Victim's vantage point, he observed that the Malibu's driver—an individual the jury later determined to be Granados—was the only occupant of the car. The Malibu eventually pulled into a right-turn lane, at which point Victim "went to pass it." As Victim did so, he observed the Malibu's driver touch the roof of the car and noticed that the driver's arm "had tattoos." After Victim passed the Malibu, it "jumped in right behind" Victim's car and inexplicably began "aggressively" following Victim, "right on [his] bumper." Victim did not recognize the Malibu and from his rearview mirror was able to observe only that the car's driver was "Hispanic."

¶3 Concerned about being so aggressively followed and wanting to "get somewhere where maybe [he] could get some help," Victim decided to drive to the home of a highway patrolman he knew. As Victim turned left, Granados drew

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Reigelsperger*, 2017 UT App 101, ¶ 2 n.1, 400 P.3d 1127 (cleaned up).

alongside him and "pulled a gun." Victim "slammed [on] the brakes," backed up his vehicle, turned down another road, and attempted to lose Granados. However, Granados "turned around and started chasing" Victim, at which point Victim called 911.

¶4    While Victim was on the phone, the Malibu hit Victim's car on the "right passenger side," causing it to "sway, skid and lose control," hit a parked SUV, and land on the front lawn of a townhome. After Victim's vehicle "came to a stop on the lawn," Granados opened fire, shooting ten rounds at Victim. One of the bullets grazed Victim's neck. Granados then fled in the Malibu.

¶5    Several witnesses observed the shooting. One witness (Witness One), a resident of the neighborhood, went outside after hearing four consecutive gunshots. She observed a "red car" down the street, "[r]ight in front of [the] townhomes," and then heard "maybe four or five more shots." At that point, the red car "made a U-turn" and went "right past" her. As it did, Witness One saw that the car was "crushed in on the passenger's side at the front" and that it had a "white license plate" and a "baby on board" "triangle" in the back window.

¶6    Another witness (Witness Two) was driving in the same area at the time. She observed a "maroon" car hit Victim's car, which then landed on the grass "facing a townhome." She then observed the car's driver pull a gun and shoot at Victim's car. While Witness Two did not see who was driving, she did observe that the driver was the only person in the car.

¶7    Yet another witness (Witness Three) was also driving in the area. Witness Three saw a "red car" with damage and another car "up on the grass with the whole passenger side caved in." As she drove slowly past both cars, she made eye contact with the red car's driver and described him as having "a round face," "really dark eyes," "short, really dark hair," and "a

mustache." Witness Three then saw the driver raise a gun and start shooting at the car on the lawn, testifying that the driver "[j]ust kept firing." Witness Three continued to drive, but in her rearview mirror observed the red car "flip a U-ey" in her direction, veer around her, and run a red light. As it did, she observed "a piece of his car fly off in the intersection." Police later recovered a headlight at that intersection. Witness Three followed the red car and called 911. On a side street she then witnessed the car's driver stop, get out of the car, pick up the front bumper that had fallen off, and put it in the car.

*Fleeing the Police*

¶8    Police were advised of the shooting incident at 4:13 p.m., almost as soon as it occurred, and immediately began a search for the Malibu. Granados was apprehended and taken into custody approximately two and a half hours later, at 6:55 p.m.

¶9    Notably, the day before the shooting, police were already attempting to locate Granados and the Malibu. The Malibu belonged to Granados's girlfriend (Girlfriend), and she had reported to police that the vehicle was missing and that Granados likely had it. Girlfriend's Malibu was maroon and had a triangular yellow "baby-on-board" sticker in the back window. Later that day, an officer (Officer One) saw the vehicle, pulled "up on the side of it," and confirmed that Granados was "actually inside the vehicle," observing that Granados was the vehicle's only occupant. When Officer One attempted to pull Granados over, Granados fled and Officer One broke off pursuit.

¶10    On the day of the shooting, several police officers assisted in apprehending Granados. An officer (Officer Two) spotted Granados in the Malibu at approximately 6:15 p.m. He observed that the Malibu had "front-end damage" and that Granados was the vehicle's sole occupant. Officer Two radioed other officers

about Granados's location and followed him for several miles, but eventually lost sight of him.

¶11    Upon receiving information that Officer Two had located Granados, a different officer (Officer Three) proceeded to a nearby location to create a containment of the area. As he did, he saw the Malibu drive right by him and also identified Granados as the driver. Along with other officers, Officer Three engaged in pursuit, following Granados through surface streets and the freeway for over twelve minutes, at times reaching speeds of approximately 95 miles per hour.

¶12    Granados eventually abandoned the Malibu in the middle of the road next to a "small apartment building" and fled on foot, but he was apprehended and arrested shortly thereafter.

*The Physical Evidence and Photo Array*

¶13    Following Granados's arrest, police searched the Malibu that Granados had abandoned in the road following the high-speed chase. The Malibu had a yellow baby-on-board sign in the back window, and the license plate matched that of Girlfriend's car. The Malibu's exterior also had extensive damage. Among other things, the car was missing the front bumper and a headlight, and the missing bumper was discovered in the car's back seat. Inside the car, officers also discovered glass shards and, on the driver's side floorboard, two live rounds, .32 caliber and .40 caliber, and ten spent .40 caliber casings.

¶14    Officers also recovered physical evidence from the shooting scene. Crime scene technicians identified markings and holes consistent with ten rounds—eight in Victim's car, one creating a trail on the sidewalk and lawn next to Victim's car, and one in the exterior of the townhome in front of Victim's car. Crime scene technicians ultimately recovered five slugs—four

from Victim's car and one on the porch of the nearby townhome. Each slug was consistent with a .40 caliber bullet. Crime scene technicians also recovered glass shards that were consistent with those discovered in the back seat of the Malibu.

¶15　Technicians conducted tests on certain evidence collected from the Malibu. First, technicians processed the front bumper for fingerprints. A partial palm print was recovered but did not match Granados. A technician also collectively processed the bullets and bullet casings for DNA, soaking each casing and bullet individually in a buffer solution and then pouring the buffer solution through a filter designed to "catch a cell where the DNA is stored." The technician poured the buffer solution for each casing and bullet through the same filter. The filter was then taken to a lab for analysis, and the analyst concluded that Granados was the major contributor to the DNA collected by the filter.

¶16　Additionally, two days after the events, police showed Witness Three a photo array that included Granados. Witness Three did not select Granados as the person she observed in the shooting, but she indicated that the photo she selected "resemble[d]" the driver and that she was not positive that it was driver of the red car. Nevertheless, the photo she selected fit the description she provided to police.

*The Trial*

¶17　The State charged Granados with, among other things, attempted murder, possession of a firearm by a restricted person, failure to stop at the command of police, and criminal mischief.[2] The case proceeded to trial. At the close of the State's

---

2. In a search incident to arrest, officers also discovered methamphetamine in Granados's sock and drug paraphernalia

(continued…)

case, Granados moved for a directed verdict on the charges related to the shooting incident. He argued that while there was sufficient evidence that he drove the Malibu during the police chase following the shooting incident, the State had not provided sufficient evidence to establish his identity as the shooter. The district court denied the motion, explaining that there had been "quite substantial evidence" from which the jury could infer that Granados "is the one that fired the shots." The court referenced the witness testimony describing both the individual and the car involved in the shooting incident. The court also referenced the various officers' testimonies identifying Granados as the driver of the Malibu both the day before the shooting incident and within two hours of it, who at that time led the officers on "quite an extraordinary chase."

¶18    During the trial, the district court also dismissed Juror 16 as disqualified and replaced her with an alternate juror. During Officer Three's testimony on the second day of trial, the court called for a break. After the jury was excused, the court explained to counsel that it had done so because Juror 16 "keeps falling asleep." The court stated that it had observed Juror 16 falling asleep the day before, which had also prompted it to take "some breaks," stating its concern that the juror was "noticeably falling asleep" in the middle of a presentation that "usually would take someone's attention." Although the court initially stated that it "just wanted to bring [counsel's] attention" to the issue and that it would "keep trying to watch," after the break

---

(…continued)

in his pocket. The State charged him with possession of a controlled substance and possession of drug paraphernalia, and he was found guilty on both counts. Granados does not challenge the sufficiency of the State's evidence for those convictions.

the court stated that, after thinking about it more and receiving input from its staff, it had decided to dismiss Juror 16.

¶19   Defense counsel objected. He stated that he had not observed Juror 16 sleeping and that he had seen her taking notes and "trying to pay attention." He also suggested that the portion of testimony during which she fell asleep was not "crucial" and that the defense had "strategically selected her" to be on the jury. Defense counsel then requested that the court admonish the juror or question her about her perception of what she had missed before dismissing her.

¶20   The court declined defense counsel's request and dismissed Juror 16 without questioning her. The court explained that it, along with both of its assistants, had observed Juror 16 "repeatedly" nod off "during significant parts of the trial" over the two days and that it "was concerned about going any further because of what she was clearly missing." While the court agreed that Juror 16 was trying to be diligent, it explained that the falling asleep "got to . . . such a point" that it could not "allow her to go forward." And responding specifically to defense counsel's request for questioning, the court explained that asking Juror 16 about "whether she knows that she missed it or not" was not necessary where both the court and its staff actually "observed her missing significant parts of the trial." The court stated that "it wasn't going to be very persuasive . . . if she was aware that she missed, because she clearly missed it and because she was asleep."

¶21   The jury convicted Granados on all counts.[3] Granados timely appeals.

---

3. For the possession of a dangerous weapon by a restricted person charge, the jury was asked to indicate whether Granados

(continued…)

ANALYSIS

¶22 Granados raises two challenges to his convictions. First, he argues that the evidence of identity was insufficient to sustain the convictions related to the shooting—attempted murder, criminal mischief, and possession of a dangerous weapon by a restricted person. Second, he argues that the district court exceeded its discretion by dismissing Juror 16 for falling asleep during the trial without questioning her before doing so.

I. Sufficiency of the Evidence

¶23 Granados argues that the evidence presented at trial was insufficient to establish that he was the shooter. He contends that the circumstantial evidence related to his identity raised "only a speculative possibility" of his guilt in the crimes surrounding the shooting. On that basis, he argues that the convictions related to those crimes should be vacated.

¶24 "On a sufficiency of the evidence claim we give substantial deference to the jury," reviewing "the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict." *State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664 (cleaned up). "We will reverse a guilty verdict

_____

(…continued)

"knowingly used a dangerous weapon" in the commission of the attempted murder only if the jury had first found Granados guilty of attempted murder. After finding Granados guilty of attempted murder, the jury determined that he had knowingly used a dangerous weapon. A separate bench trial was then held on whether Granados was a restricted person for purposes of the charge. The court determined that he was and so found him guilty of that charge. On appeal, Granados's challenge to this conviction is limited to whether he was the shooter.

only when the evidence . . . is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *State v. MacNeill*, 2017 UT App 48, ¶ 51, 397 P.3d 626 (cleaned up). In this respect, "[a]s long as there is some evidence from which all the necessary elements of the charged offenses can be proved, there is sufficient evidence to find the defendant guilty beyond a reasonable doubt." *State v. Johnson*, 2015 UT App 312, ¶ 11, 365 P.3d 730; *see also State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (reviewing the denial of a directed verdict and stating that "we will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt" (cleaned up)).

¶25    Granados challenges the sufficiency of the evidence establishing the element of his identity as the shooter.[4] Identification of the defendant "as the person who perpetrated the crime charged" is an "essential element" that must be proven beyond a reasonable doubt. *State v. Cowlishaw*, 2017 UT App 181, ¶ 13, 405 P.3d 885 (cleaned up).

¶26    As Granados acknowledges, identity may be proven by circumstantial evidence. *State v. Isom*, 2015 UT App 160, ¶ 23 n.2, 354 P.3d 791; *see also State v. Harris*, 2015 UT App 282, ¶ 9, 363 P.3d 555 (stating that "it is a well-settled rule that circumstantial evidence alone may be sufficient to establish the guilt of the accused" (cleaned up)). Convictions based on circumstantial

---

4. We therefore assume for purposes of this appeal that there was sufficient evidence to support every other element of the crimes related to the shooting for which he was convicted, and we do not address the other elements.

evidence are reviewed to determine whether there is "any evidence" to support the challenged elements and whether the inferences of guilt drawn from that evidence are reasonable. *MacNeill*, 2017 UT App 48, ¶ 56 (cleaned up). "A reasonable inference is a conclusion that can be drawn from the evidence and is based on logic and reasonable human experience." *Harris*, 2015 UT App 282, ¶ 9 (cleaned up); *see also Salt Lake City v. Carrera*, 2015 UT 73, ¶ 12, 358 P.3d 1067 (stating that an inference is reasonable and non-speculative if "there is an evidentiary foundation to draw and support the conclusion"). In this respect, an inference is reasonable "unless it falls to a level of inconsistency or incredibility that no reasonable jury could accept." *Ashcraft*, 2015 UT 5, ¶ 18 (cleaned up).

¶27    Granados challenges the sufficiency of the circumstantial evidence establishing his identity as the shooter by pointing to specific pieces of evidence and advancing what he claims are the "stronger" and "more consistent" inferences to be drawn from those pieces of evidence. For example, Granados points to his flight from police following the shooting, contending that because he had also fled from police the day before, "the jury could not infer that Granados was guilty of the shooting." Likewise, he contends that the more reasonable inference to be drawn from the DNA evidence obtained from the bullets and shell casings discovered in the Malibu was that his DNA came from the live shells, not from the casings, and that his DNA was present through transfer, not direct touch. He also points to the non-matching palm print recovered from the bumper, Witness Three's failure to select him from the photo array, and his apparent lack of connection to Victim as more reasonably pointing to innocence.

¶28    However, our role in reviewing sufficiency claims is not to second-guess the inferences adopted by the jury to determine whether "some other (innocent) inference might have been reasonable" from the evidence. *Id.* ¶¶ 22–27. We are tasked with

simply determining "whether the inference adopted by the jury was sustainable." *Id*. After all, the jury, not the appellate court, is the "exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." *State v. Cegers*, 2019 UT App 54, ¶ 41, 440 P.3d 924 (cleaned up). And a jury is not "obligated to believe the evidence most favorable to [the] defendant," nor does the "existence of contradictory evidence or of conflicting inferences . . . warrant disturbing the jury's verdict" on appeal. *State v. Howell*, 649 P.2d 91, 97 (Utah 1982); *see also Johnson*, 2015 UT App 312, ¶¶ 10–12; *State v. Buck*, 2009 UT App 2, ¶ 14, 200 P.3d 674 (stating that "it is perfectly appropriate for a jury to reject a reasonable alternative hypothesis presented by the defense, and to convict the defendant," and that presentation of such an alternative hypothesis is "not enough" to merit reversal on appeal).

¶29    Moreover, even if certain pieces of evidence might not, on their own, provide a reasonable basis for inferring identity, or perhaps could carry an innocent explanation, our review is limited to "whether the jury's verdict is reasonable in light *of all of the evidence taken cumulatively*, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *Ashcraft*, 2015 UT 5, ¶¶ 22, 24 (emphasis added). As we observed in *MacNeill*, guilt may be proven beyond a reasonable doubt by "a mosaic of circumstantial evidence . . . considered as a whole." 2017 UT App 48, ¶ 57 (cleaned up). We affirm under these well-settled standards.

¶30    Here, the evidence in its totality provided the jury a sufficient basis from which to infer beyond a reasonable doubt that Granados was the shooter. To begin with, there is substantial evidence suggesting that the car involved in the shooting was the same car involved in the high-speed police chase. Witnesses testified that the car involved in the shooting was red or maroon with a baby-on-board sign in the back; that the car sustained front-end damage from hitting Victim's car;

that the car lost a headlight upon fleeing the scene; and that the car's front bumper fell off after the shooting and the driver placed it in the car. In comparison, the car Granados was spotted in two hours later, and which he subsequently abandoned in the middle of the road following the high-speed chase, was red or maroon with a triangular baby-on-board sign in the rear window, front-end damage, a missing headlight, and a front bumper sitting in the back seat.

¶31    There is also some evidence from which the jury could have reasonably inferred that Granados was the shooter. There was evidence that the Malibu recovered after the high-speed chase was Girlfriend's car. Before the shooting, Girlfriend had informed police that her Malibu was missing and that Granados likely had it, and the license plate number and description of Girlfriend's car matched that of the vehicle involved in the high-speed chase. To that end, the day before the shooting, Granados was positively identified by police as driving the Malibu. And within two hours of the shooting, multiple officers positively identified Granados driving the Malibu in a neighboring city.

¶32    In addition, as the district court recognized, Granados fit the description of the shooter provided by Victim and an eyewitness—a Hispanic male with a round face; short, dark hair and dark eyes; a tattooed arm; and what appeared to be a mustache. Witnesses also stated that the shooter was the only occupant of the vehicle. Further, the jury heard evidence that Granados's DNA was recovered from the spent casings and rounds discovered on the floor of the car; the analyst testified that Granados was the major contributor to the DNA recovered from the casings and rounds.

¶33    Finally, the jury heard evidence about the circumstances of the high-speed police chase following the shooting. Within approximately two hours of the shooting, Granados led police on a high-speed chase through neighborhoods and the freeway,

reaching speeds of 95 miles per hour, before abandoning the Malibu in the middle of the road and attempting to elude the officers on foot. *See State v. Franklin*, 735 P.2d 34, 39 (Utah 1987) ("We have previously ruled that evidence of flight is probative."), *overruled on other grounds by State v. Robertson*, 2017 UT 27, 438 P.3d 491; *State v. Escobar-Florez*, 2019 UT App 135, ¶ 54 (recognizing that "evidence of flight is probative because it can demonstrate consciousness of guilt" (cleaned up)).

¶34 Considered in its totality, this evidence is a "mosaic of circumstantial evidence that considered as a whole" was sufficient to allow the jury to reasonably infer that Granados was the shooter. *See MacNeill*, 2017 UT App 48, ¶ 57 (cleaned up); *see also Ashcraft*, 2015 UT 5, ¶¶ 22–30 (explaining that evidence in a sufficiency challenge is reviewed "cumulatively" and assessed in its totality). The evidence places Granados in the same vehicle involved in the shooting both the day before and within two hours of the incident, and provides a reasonable basis to connect Granados to the shooting itself.

¶35 To be sure, each individual piece of evidence Granados identifies perhaps could have suggested a finding of innocence or might not have been enough on its own to sustain reasonable inferences about Granados's involvement in the shooting. But on a sufficiency challenge, we cannot reverse based on conflicts surrounding individual pieces of evidence or because the jury perhaps could have drawn inferences supporting Granados's innocence. *See Ashcraft*, 2015 UT 5, ¶¶ 22–30. And indeed, the jury was presented with evidence that may have supported a different verdict. For example, the jury heard testimony that the palm print recovered from the front bumper of the Malibu was not a match to Granados. Likewise, through cross-examination Granados challenged the overall reliability of the DNA evidence. And the jury was presented evidence that Witness Three failed to identify Granados in the photo array. But these (and other) conflicts in the evidence were the jury's to weigh and resolve,

and that the jury ultimately resolved them in favor of guilt rather than innocence is not enough, on its own, to merit reversal on appeal. *See id.*; *Johnson*, 2015 UT App 312, ¶¶ 10–11.

¶36 In short, there is sufficient evidence to support Granados's convictions related to the shooting—attempted murder, criminal mischief, and possession of a firearm by a restricted person—and our inquiry is at an end. *See Ashcraft*, 2015 UT 5, ¶¶ 22–30; *see also State v. Lucero*, 2012 UT App 202, ¶ 2, 283 P.3d 967 (explaining in the context of a sufficiency claim that the appellate court's "inquiry ends when there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made" (cleaned up)).

## II. Sleeping Juror

¶37 Granados next argues that the district court violated rule 17(g) of the Utah Rules of Criminal Procedure when it determined that Juror 16 was disqualified and dismissed her, replacing her with an alternate juror. Rule 17(g) provides that "[i]f a juror becomes ill, disabled or disqualified during trial and an alternate juror has been selected, the case shall proceed using the alternate juror." Utah R. Crim. P. 17(g). Here, the court disqualified Juror 16 for sleeping during significant portions of the trial over a two-day period, and on that basis dismissed her.

¶38 Jurors may be disqualified for falling asleep during trial. *See State v. Marquina*, 2018 UT App 219, ¶¶ 29–33, 437 P.3d 628 (addressing a claim that the district court was required to conduct voir dire of an allegedly sleeping juror to determine whether the juror had missed important testimony), *cert. granted*, 440 P.3d 691 (Utah 2019); *see also United States v. Freitag*, 230 F.3d 1019, 1023–24 (7th Cir. 2000) (explaining that if "sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping

juror should be removed from the jury"); *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972) (per curiam) (stating that "a juror who cannot remain awake during much of the trial is unable to perform his duty" and that the court did not exceed its discretion in removing the juror in such circumstances). Granados nevertheless argues that the court erred because it "could not determine, without first questioning the juror, that the juror was sleeping to the point of disqualification from service." We must therefore determine whether the court violated rule 17(g) by making its disqualification determination without first questioning the juror.

¶39 We discern no violation of the rule in the district court's disqualification of Juror 16. There is no hard-and-fast rule governing how a district court must deal with sleeping jurors. Rather, our cases establish that in dealing with sleeping jurors, district courts have considerable discretion in determining how best to resolve the issue. *See Marquina*, 2018 UT App 219, ¶ 29 ("In the handful of Utah appellate cases discussing a sleeping juror's effect on a trial, one principle predominates: discretion."); *see also State v. Lesley*, 672 P.2d 79, 82 (Utah 1983) (concluding that the trial court did not exceed its discretion in denying a motion for a new trial based on one juror's apparent drowsiness, and stating that "[t]he trial judge was in a position to gauge the degree, if any, of the juror's incapacity to serve in the trial"). Indeed, as this court recently explained in *Marquina*, there is no "template trial courts must follow whenever they are confronted with reports of a sleepy juror." 2018 UT App 219, ¶ 31.

¶40 Here, we conclude that the district court did not exceed its considerable discretion when it decided to disqualify and dismiss Juror 16 for sleeping without first questioning her. Both the court and its staff observed Juror 16 over a two-day period repeatedly fall asleep and miss significant portions of the trial. Over those two days, the court had also attempted to allay the

problem by calling for breaks, explaining to counsel that it had taken recesses during the trial specifically because of Juror 16.

¶41 And as the court explained, questioning Juror 16 about her perception of sleeping or what she believed she had missed was not necessary for its disqualification determination because, based on its own observations, it was "obvious" and "clear" that she had been sleeping and had "missed a significant amount." *See id.* ¶¶ 29–33 (emphasizing the district court's discretion in handling sleeping jurors); *State v. Mellor*, 272 P. 635, 639 (Utah 1928) (same); *see also Freitag*, 230 F.3d at 1023–24 (no abuse of discretion for the district court not to inquire further into the allegedly sleeping juror issue, particularly where the court "had not noticed an extensive sleeping problem"); *United States v. Holder*, 652 F.2d 449, 451 (5th Cir. 1981) (no abuse of discretion under federal rule of criminal procedure addressing disqualification of jurors for failing to question a juror who allegedly fell asleep where the court had observed the juror itself and had concluded that the juror was not asleep). In these circumstances, we cannot say that the court's refusal to question Juror 16 about the sleeping incidents or what she felt or believed she had missed before disqualifying her exceeded its discretion.

¶42 Accordingly, the district court did not violate rule 17(g) when it disqualified Juror 16 without first questioning her about the sleeping incidents.

CONCLUSION

¶43 We conclude that there was sufficient evidence presented to permit the jury to reasonably infer that Granados was involved in the shooting. We also conclude that the district court's disqualification of Juror 16 did not violate our rules of criminal procedure. We therefore affirm Granados's convictions.

_____