**2023 UT App 131**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAMES ANDREW NARANJO,
Appellant.

Opinion
No. 20210865-CA
Filed November 2, 2023

First District Court, Brigham City Department
The Honorable Spencer D. Walsh
No. 201100285

Benjamin Miller, Attorney for Appellant

Sean D. Reyes and Marian Decker,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1    Perhaps to pass the time while waiting in a state park's parking lot at the crack of dawn, James Andrew Naranjo used various sticky implements to steal fee envelopes his fellow citizens had placed into a self-pay box. His actions were observed by an angler, who called the police. An officer arrived to find Naranjo joined by two others in an apparent drug transaction. A circus of sorts ensued, involving an extremely low-speed pursuit attended by evidence of the recent envelope thefts and drugs being tossed from a vehicle. Charges and a trial followed, and Naranjo was convicted of several offenses, including failure to respond to an officer's signal to stop and possession of a

controlled substance. Naranjo appeals on various grounds, including ineffective assistance of counsel. We affirm.

BACKGROUND

¶2    Around 5:00 a.m. on a July 2020 morning, an angler, who was fishing at Willard Bay State Park, noticed Naranjo sitting inside a maroon-colored car in the marina parking lot. The angler reported that he saw a pile of manila-colored envelopes, apparently those used to pay the day-use fee for the marina, inside the car. He believed that Naranjo had torn open the envelopes and was removing the cash from them. The angler called the police, and the dispatcher asked the angler to get the car's license plate number. On his way back to get the number, the angler saw a black car pull into the lot. A man and a woman got out and started talking to Naranjo, who was still seated in the maroon car. The angler reported the maroon car's plate number to the dispatcher.

¶3    A uniformed police officer (Officer) arrived around 6:00 a.m., driving a patrol truck with police logos and a lightbar, which was not turned on at the time. Officer saw three people inside the maroon car on his arrival: Naranjo in the driver seat, a man in the passenger seat, and a woman in the back passenger seat. As Officer pulled near the maroon car, the woman got out and went to a nearby restroom. Officer parked his truck facing the maroon car. Officer got out of the patrol truck and began to walk toward the car, at which point Naranjo started to drive away.

¶4    Officer put up his hands, "palms out in halting fashion," and verbally ordered Naranjo to "[s]top." Officer acknowledged that Naranjo's windows were rolled up when he gave the direction to stop. As Naranjo drove past, Officer returned to his patrol truck and activated the lightbar. Naranjo did not stop but drove "erratically" around the parking lot, making a U-turn and

several "quick braking movements" and twice trying to pull into marked parking spots. Officer said that he "made eye contact" with Naranjo and "tried to signal [him to] slow down or stop." Naranjo stopped in a third marked parking spot, and Officer opened the driver-side door of his patrol truck, apparently to approach Naranjo's car. But when Naranjo saw this, he put his car "back into drive and continued to drive around the parking lot."

¶5     Believing that Naranjo "was not going to stop," Officer drove toward the exit, using his truck to block the lone point of egress.

¶6     Meanwhile, the woman got behind the wheel of the black car. The man had gotten out of Naranjo's car and into the black car at some point after Officer had left to block the gate. Officer then saw the black car driving toward him at the exit. The woman and the man "gestured" to Officer that they wanted him "to move out of the way and threw their arms up in the air." Officer apparently did not respond as they wanted, so they attempted to go around the patrol truck. Officer then hit the black car with his truck, pinning the fleeing car against a fence post. The couple then got out and began to flee on foot. The pair was apprehended by another officer.

¶7     Naranjo, who had by this point backed into a berm and wooden fence surrounding the parking lot, continued his efforts "to drive away," according to Officer. Officer got out of his truck, drew his firearm, and commanded Naranjo to stop. Naranjo stopped, rolled down his window, and "started throwing items out," including "small plastic baggies and pieces" of the fee envelopes, insisting that "they weren't his." Officer told Naranjo to turn off the car "at least five" times, but Naranjo never complied.

¶8     Officer ordered Naranjo "not to move." Naranjo responded that he was "scared" and "did not want to go to jail."

During this time, Officer reported that Naranjo "continued reaching around in the compartments in the vehicle, underneath the seat, [and] around the seat [to] whatever was within arm's reach of him."

¶9     Officer ordered Naranjo to open the driver-side door, but he did not, so Officer walked to the car, opened the door, and ordered Naranjo to get out. Naranjo was then taken into custody.

¶10     A search of Naranjo yielded some one-dollar bills. In the search of his car, police found "burglary tools," including gloves with sticky residue, sticky mouse traps, and wire strippers with sticky residue on them. Police also found fee envelopes with sticky residue on them and some small bills (fives and ones) in the car, along with drug paraphernalia (namely, small plastic baggies, lighters, a scale, needles, and a spoon) and yellow pills inside a black carrying case that had been on the driver-side back seat. Notably, Naranjo's identification card was also in the black carrying case.[1] A zippered bag in the black case contained more

---

1. After oral argument, Naranjo's appellate counsel submitted a letter challenging an assertion made by the State during oral argument that the identification card was found in the black case. *See* Utah R. App. P. 24(j) ("When authority of central importance to an issue comes to the attention of a party after briefing or oral argument but before decision, that party may file a notice of supplemental authority setting forth: (1) the citation to the authority; (2) a reference either to the page of the brief or to a point argued orally to which the authority applies; and (3) relevance of the authority."). The State responded, stating that "it is not clear that [Naranjo's] identification was in fact found inside the black case."

But our review of the trial transcript shows that the jury heard that Naranjo's identification card was found inside the black case. One of the police sergeants, in his testimony before the

(continued…)

small plastic baggies, including one with a heart-stamp design. Additionally, officers found dirt and other debris lodged in the exhaust pipes of Naranjo's car, apparently acquired when he backed into the berm supporting the fence around the parking lot. Officers also found gouges in the berm caused by the exhaust pipes of Naranjo's car backing into it.

¶11    In the other car—the black one driven by the couple— police found narcotic-contaminated foil and drug paraphernalia, including spoons, needles, and baggies featuring heart stamps.

¶12    Officer advised other officers assisting in the search of the lot that "the suspects were seen throwing some things out the window of their vehicle" and "that items were being thrown out of the vehicles as they attempted to run."

¶13    One investigator found a metal rod with sticky residue, which police suspected Naranjo had used to retrieve the envelopes from the drop box. The rod was found near where Naranjo had backed into the fence and did not appear to have been there long because the residue was still tacky.

¶14    Police found other items near where Naranjo had stopped his car in the parking lot, including drug paraphernalia, baggies,

---

jury, identified the black case in a photo exhibit. He testified that he found that case on the driver-side back seat of Naranjo's car. The prosecutor asked him, "And did you have a chance to see the contents of that?" The sergeant responded that he did. Then the sergeant was shown the photo exhibits of the contents—including the identification card—of the black case. The prosecutor asked him if the photos displayed "the contents of that box that [he] found in the [maroon] car." The sergeant said that they did. *See State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 ("On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." (cleaned up)).

foil, torn cash, and fee envelopes. One of those baggies had the heart-stamp design and contained "a crystal-like substance" that was later identified as methamphetamine.

¶15 Naranjo was charged with failure to respond to an officer's signal to stop and possession of a controlled substance.[2]

¶16 Naranjo was tried before a jury. At the close of the State's case, Naranjo moved for a directed verdict. With regard to the failure to stop, Naranjo argued that "[t]here was not evidence that would lead . . . a reasonable trier of fact to determine . . . that event happened." The State responded by arguing that Officer had provided a "detailed account of what happened," including that he had "not only given visual signals with his hands to stop" but also activated "the lights on his truck trying to get him to stop" and "finally drew his weapon" to get Naranjo "to stop."

¶17 For the possession count, Naranjo argued that the evidence did not show he possessed the methamphetamine because the "substances were found outside the vehicle." The State contended that "just as with all the other evidence that was tossed out the window, there's no reason to suggest that the methamphetamine wasn't also from" Naranjo.

¶18 The court denied the directed verdict motion, concluding that "some evidence exists from which a reasonable jury could find . . . that the elements of the crime have been proven beyond a reasonable doubt."

¶19 Regarding the failure to stop, the court stated that "we have the testimony of Officer[,] . . . who indicate[d] that he saw

---

2. Naranjo was also charged with and convicted of theft, interference with an arresting officer, possession of drug paraphernalia, and possession of burglary tools. He does not challenge these convictions on appeal.

[Naranjo] operating the vehicle," "that he indicated to . . . Naranjo by raising his hands that he was to stop," and that he "turned on his overhead" lightbar. And even after these efforts, Officer testified that Naranjo still "attempted to flee or [elude] him." The court noted that there was "some corroboration" of Officer's account through the testimony of the angler, "who testified that he saw the maroon vehicle attempting to leave and he saw the lights flashing." And concerning the possession charge, the court noted that Officer testified that he saw "Naranjo attempting to throw items out of the vehicle. And in that same vicinity, according to the testimony of several witnesses, a [baggie] of . . . methamphetamine was found."

¶20 As relevant here, on the failure-to-stop count, the jury was instructed it must determine beyond a reasonable doubt that Naranjo "did knowingly receive a visual or audible signal from a law enforcement officer to bring a vehicle to a stop" and "did intentionally . . . attempt to flee or elude a law enforcement officer by vehicle or other means."

¶21 The jury convicted Naranjo of all charges. Naranjo appeals.

ISSUES AND STANDARDS OF REVIEW

¶22 Naranjo raises two issues on appeal. First, he argues that the evidence was insufficient to support his "convictions for failure to respond to a police officer's signal to stop and for possession of a controlled substance."[3] "In assessing a claim of

---

3. The State contends the sufficiency challenge was not preserved in Naranjo's motion for a directed verdict. While the motion was rather spartan, the record makes clear that the court understood and ruled on the issue it raised. And "an issue is preserved for appeal when it has been presented to the district court in such a

(continued…)

insufficiency of the evidence, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645 (cleaned up). "And we will not reverse a jury verdict if we conclude that *some evidence* exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Holsomback*, 2022 UT App 72, ¶ 18, 513 P.3d 82 (emphasis added) (cleaned up).

¶23    Second, Naranjo claims that he received ineffective assistance because his trial counsel did not request a "unanimity jury instruction for failure to respond to an officer's command to stop." "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Alarid*, 2022 UT App 84, ¶ 24, 514 P.3d 610 (cleaned up), *cert. denied*, 525 P.3d 1261 (Utah 2022).

ANALYSIS

I. Sufficiency of the Evidence

¶24    "When reviewing the sufficiency of the evidence, an appellate court gives substantial deference to the jury." *State v. Holsomback*, 2022 UT App 72, ¶ 21, 513 P.3d 82 (cleaned up). "And a jury is not obligated to believe the evidence most favorable to the defendant, nor does the existence of contradictory evidence or of conflicting inferences warrant disturbing the jury's verdict on appeal." *State v. Granados*, 2019 UT App 158, ¶ 28, 451 P.3d 289 (cleaned up), *cert. denied*, 462 P.3d 800 (Utah 2020). "Thus, we will

---

way that the court has an opportunity to rule on it." *State v. Suhail*, 2023 UT App 15, ¶ 89, 525 P.3d 550 (cleaned up), *cert. denied*, 531 P.3d 730 (Utah 2023).

reverse a jury verdict only when the evidence," when viewed "in the light most favorable to the verdict of the jury," "is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *State v. Maestas*, 2012 UT 46, ¶ 302, 299 P.3d 892 (cleaned up).

¶25 Considering this standard, we conclude the State presented "some evidence from which a reasonable jury could find beyond a reasonable doubt" that Naranjo failed to respond to an officer's signal to stop and possessed a controlled substance. *Holsomback*, 2022 UT App 72, ¶ 24 (cleaned up).

A. Failure to Stop

¶26 Naranjo argues that the "evidence was insufficient to support [his] conviction for failure to stop at a police command." We disagree.

¶27 The State needed to show that Naranjo knowingly received Officer's "visual or audible signal" to stop and intentionally attempted "to flee or elude" Officer. *See* Utah Code § 41-6a-210(1)(a); *see also State v. Bird*, 2015 UT 7, ¶ 26, 345 P.3d 1141 (explaining the requirement of knowing and intentional mental states for failure to stop). The State presented much more than "some evidence" of these elements on which the jury could convict Naranjo, *Maestas*, 2012 UT 46, ¶ 177 (cleaned up), demonstrating that the jury's verdict was not based on speculation or gaps in the evidence as Naranjo contends.

¶28 First, the State presented evidence of Naranjo's initial response to Officer's signal to stop. Officer arrived, uniformed and in a marked patrol truck, in the marina parking lot and then parked facing Naranjo's car. As Officer walked toward Naranjo's car, Naranjo began driving away. At this point, Officer put up his hands and verbally told Naranjo to stop. But Naranjo continued

to drive past Officer. Even if Naranjo's windows were rolled up, interfering with his ability to hear, the jury could have reasonably concluded that it was light enough on a July morning for Naranjo to have seen Officer's hand signal to stop. And given the small number of cars present at that hour and Officer's proximity to Naranjo's car, the jury could have reasonably concluded that Naranjo should have known that Officer was signaling him to stop.

¶29   Second, the State presented evidence of Naranjo continuing to disregard Officer's signals to stop. Even if Naranjo had failed to notice Officer's initial verbal command and hand signal, the jury could have reasonably concluded that when Officer then turned on the patrol truck's flashing red-and-blues, it would have been hard to go unseen or misunderstood. Instead of stopping, Naranjo continued to drive "erratically" around the parking lot, making a U-turn and two attempts to park in marked stalls. Naranjo continued driving, despite Officer making eye contact with him and signaling him to "slow down or stop." And after Naranjo pulled into a third stall and apparently stopped, he again began driving around the parking lot as soon as Officer got out of his patrol truck. The jury could have reasonably concluded from this behavior that Naranjo was engaging in cat-and-mouse maneuvering as he either weighed his options to find a viable escape route or bought time to rid himself of contraband in his possession.

¶30   Third, the State presented evidence that Naranjo attempted to flee from the parking lot after receiving several signals to stop. When Officer was occupied with blocking the entrance and dealing with the other two suspects, Naranjo backed into a fence surrounding the parking lot. The State presented evidence of the damaged fence and gouges in the berm, along with dirt and other debris that accumulated in the tailpipes of Naranjo's car when he backed into the berm. From this evidence, the jury could have reasonably concluded that Naranjo, seeing that Officer was

occupied with the other suspects, made an ill-advised attempt to break through the fence to access the road.

¶31     Fourth, the State presented evidence that Naranjo continued to disregard Officer's signal to stop even after Officer had pinned the black car against the fence and had turned his attention back to Naranjo. Officer testified that he observed Naranjo "still in his vehicle and still driving around in the parking lot." He got out of his patrol truck, drawing his firearm and commanding Naranjo to stop. But even then, Naranjo only partially complied. While he did stop driving, he did not turn off his car—despite being told to do so at least five times—and he engaged in a frantic effort to throw various incriminating items out his window. From this, the jury could have reasonably concluded that Naranjo intended to continue his efforts to flee or elude Officer, at least until Officer opened the driver-side door and took him into custody.

¶32     Naranjo also argues that an officer's signal to stop must "be given before the driver begins to drive away from the officer." Thus, he reasons that none of Officer's commands to stop establish that Naranjo knowingly received the signal to stop. Naranjo appears to assert there was not enough evidence to support that he saw Officer's signal as he drove away. We are unpersuaded. Naranjo's reading of the failure-to-stop statute is at clear variance with the text, which states that "[a]n operator who receives a visual or audible signal from a law enforcement officer to bring the vehicle to a stop may not . . . attempt to flee or elude a law enforcement officer by vehicle or other means." Utah Code § 41-6a-210(1)(a). The phrase "bring the vehicle to a stop" clearly anticipates that a vehicle is moving when the command to stop is given. One cannot logically "bring" a vehicle "to a stop" if that vehicle is not moving in the first place. Moreover, the evidence presented to the jury clearly indicates that Naranjo was aware of Officer. Not only did Officer say he made eye contact with Naranjo, but there is evidence that Naranjo's evasive maneuvers

were made in direct response to Officer's actions, such as when Naranjo began driving again as soon as he noticed Officer exiting his patrol truck.

¶33 Naranjo further argues that he never showed an intent to flee or elude because he drove only slowly around the parking lot, stopped occasionally, and did not drive toward the exit.[4] The problem with this argument is that it ignores alternative inferences that the jury likely drew in support of the intent to flee or elude Officer, such as that Naranjo drove slowly and stopped occasionally because he was looking for another exit or to buy time to rid himself of contraband. And the jury could have concluded that Naranjo feared that heading for the exit would have resulted in his immediate apprehension or triggered a more aggressive pursuit, depriving him of the opportunity to jettison the contraband. That Naranjo's efforts in fleeing or eluding Officer were obtuse and poorly thought out is without import. The fact remains that the jury received abundant evidence that Naranjo repeatedly tried to flee or elude Officer, albeit ineffectively and incompetently.

¶34 Thus, we conclude that any of Officer's signals to get Naranjo to stop would have provided "some evidence" from which the "jury could find that the elements of the crime"—that Naranjo knowingly received Officer's signal or command to stop and intentionally continued in his effort to flee or elude Officer— "had been proven beyond a reasonable doubt." *See Maestas*, 2012 UT 46, ¶ 177 (cleaned up).

---

4. Even a slow-speed chase in a parking lot carries some risk of harm to pedestrians and property. And, as is evident here, such behavior is, at the very least, distracting to law enforcement officers as they deal with other suspects. Thus, far from being benign, Naranjo's behavior was potentially harmful to others and interfered with Officer's attempts to investigate the scene.

B.     Drug Possession

¶35    Naranjo argues that the evidence was insufficient to support his conviction of possession of the controlled substance that was found in the parking lot, specifically because he "neither had special control of the area where the drugs were found nor was he in possession of similar contraband."

¶36    Along with what we have already explained about our review of sufficiency-of-the-evidence claims, *see supra* ¶ 24, we note that "[d]irect evidence is not required" for a jury to reach a conviction, *see State v. Nielsen*, 2014 UT 10, ¶ 47, 326 P.3d 645. In fact, "[s]ustainable verdicts are entered every day on the sole basis of circumstantial evidence." *Id.*; *see also State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664 ("Inferences may reasonably be drawn from circumstantial evidence."). And "the idea that circumstantial evidence is necessarily less convincing and of less value than direct evidence is a misstatement of the law. On the contrary, circumstantial evidence may even be more convincing than direct testimony." *State v. MacNeill*, 2017 UT App 48, ¶ 57, 397 P.3d 626 (cleaned up).

¶37    The State had to show that Naranjo "knowingly and intentionally" possessed the methamphetamine found in the parking lot, *see* Utah Code § 58-37-8(2)(a), which the State presented as constructive possession. Constructive possession is a theory under which a jury is "asked to draw an inference based on circumstantial evidence connecting [a defendant] with the contraband." *Ashcraft*, 2015 UT 5, ¶ 10. "To find that a defendant had constructive possession of a drug or other contraband, it is necessary to prove that there was a sufficient nexus between the accused and the drug to permit an inference that the accused had both the power and the intent to exercise dominion and control over the drug." *State v. Fox*, 709 P.2d 316, 319 (Utah 1985); *accord Ashcraft*, 2015 UT 5, ¶ 19.

¶38   Our caselaw has "identified some relevant considerations" a jury may take into account to establish possession, including "ownership and/or occupancy of the residence or vehicle, presence of the defendant when the contraband is discovered, the defendant's proximity to the contraband, . . . incriminating statements or behavior, and presence of contraband in a specific area where the defendant had control." *Ashcraft*, 2015 UT 5, ¶ 19. In light of these considerations, there is no question that the State presented more than "some evidence," *see Maestas*, 2012 UT 46, ¶ 177 (cleaned up), to establish that Naranjo constructively possessed the methamphetamine found in the parking lot.

¶39   First, Naranjo exhibited incriminating behavior in the parking lot. Most notably, Officer observed Naranjo throwing "small plastic baggies" from his car and announcing that "they weren't his." And when the parking lot was searched after Naranjo's arrest, a small plastic heart-stamped baggie containing methamphetamine was found a few spaces away from where Naranjo ultimately stopped his car. A jury could reasonably conclude that this methamphetamine baggie was discarded by Naranjo when Officer saw him throwing items from his car. Alternatively, the jury could have just as reasonably concluded that Naranjo had thrown the methamphetamine baggie out of his car earlier when Officer was occupied with blocking the entrance or during Naranjo's tour of the lot.

¶40   Second, Naranjo's identification card being found in the black carrying case provided evidence from which the jury could have inferred Naranjo possessed the contraband. Finding his identification card in the same black case that also contained a heart-stamped baggie provided a strong link between Naranjo and the methamphetamine baggie found in the parking lot. That the black case was found on the back seat is of little significance in refuting this link for several reasons. For one thing, Naranjo's identification card was found in the black case, providing robust evidence that the case and its contents belonged to him. Moreover,

Officer testified that he saw Naranjo moving items about the interior of the car during the parking lot pursuit, so Naranjo had ample opportunity to create a little distance between the incriminating evidence and his physical reach by tossing it in the back seat.

¶41   Third, a jury could have reasonably inferred from Naranjo's statements that the items he was throwing from the car "weren't his" and that he "did not want to go to jail" that Naranjo knew the tossed items contained evidence that indicated he was in possession of a controlled substance and that he was trying to distance himself from them as much as possible.

¶42   Fourth, the jury could have reasonably concluded that Naranjo and the other two suspects were involved in a drug deal in Naranjo's car and that they jointly possessed the methamphetamine because the methamphetamine baggie found in the parking lot featured the same heart-stamp design as the baggie found in Naranjo's car and the baggies found in the black car. *See State v. Nihells*, 2019 UT App 210, ¶ 13, 457 P.3d 1121 ("[C]ontraband may be possessed either individually or jointly with others."); *see also* Utah Code § 58-37-2(1)(ii) ("For a person to be a possessor . . . of a controlled substance, it is not required that the person be shown to have individually possessed . . . the substance, but it is sufficient if it is shown that the person jointly participated with one or more persons in the . . . possession . . . of any substances with knowledge that the activity was occurring . . . .").

¶43   Fifth, from the sticky metal rod found near where Naranjo backed into the fence and the torn fee envelopes and cash, the jury could have reasonably concluded that Naranjo was the one most likely to be throwing items out of his car, including the baggie with methamphetamine. While it is true that other responding officers were told that the "suspects" generally "were seen throwing some things out of the window of their vehicle," it is

also true that much of what was found in the parking lot was directly linked to Naranjo, providing the jury reason to conclude that the methamphetamine baggie, which was found close to where Naranjo finally stopped, most likely came from Naranjo. After all, only Naranjo was specifically reported to have been seen throwing *baggies* out of his car. And only Naranjo was reported to have been driving around the parking lot, while the evidence suggests that the other suspects made a beeline for the exit upon seeing Officer executing his blocking maneuver.

¶44    These circumstances, when taken together, provided "some evidence," *see Maestas*, 2012 UT 46, ¶ 177 (cleaned up), of a "sufficient nexus between [Naranjo] and the [methamphetamine] to permit an inference that [Naranjo] had both the power and the intent to exercise dominion and control over" the drugs found in the parking lot, *see Ashcraft*, 2015 UT 5, ¶ 19. And while the evidence might have given rise to other reasonable inferences, Naranjo does not enjoy the presumption that those inferences should be given more weight simply because they present an alternative explanation favorable to him. *See id.* ¶ 27 ("The question presented [in a sufficiency of the evidence analysis] is not whether some other (innocent) inference might have been reasonable. It is simply whether the inference adopted by the jury was sustainable."); *accord State v. Darnstaedt*, 2021 UT App 19, ¶ 35 n.6, 483 P.3d 71, *cert. denied*, 496 P.3d 716 (Utah 2021).

¶45    In sum, we conclude that "some evidence" existed for the jury to find beyond a reasonable doubt that Naranjo failed to respond to an officer's signal to stop and possessed a controlled substance. *See Holsomback*, 2022 UT App 72, ¶ 24 (cleaned up).

### II. Ineffective Assistance of Counsel

¶46    Naranjo argues that the jury instruction for failing to stop was insufficient because it did not require the jury to be unanimous in two respects: (1) it left open which specific act of

Officer constituted the signal to stop and (2) it did not ask the jury to agree on which of Naranjo's acts constituted failure to respond. For the signal to stop, Naranjo argues that the jury could have identified four different actions: (a) Officer approaching the car with hands out, (b) Officer activating the lightbar, (c) Officer approaching the car the second time, and (d) Officer approaching with gun drawn. And for failing to respond, Naranjo again identifies four different actions that could have divided the jury: (a) Naranjo driving away when Officer first approached on foot, (b) Naranjo continuing to drive after Officer activated the lightbar, (c) Naranjo driving again after temporarily parking, and (d) Naranjo still driving after Officer returned from dealing with the other two suspects at the gate. Given these possibilities, Naranjo argues that his trial counsel (Counsel) rendered ineffective assistance in failing to "ensure that the jury was properly instructed that they must unanimously agree on which act constituted the offense."

¶47    "To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) . . . counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *State v. Wright*, 2021 UT App 7, ¶ 52, 481 P.3d 479 (cleaned up), *cert. denied*, 496 P.3d 718 (Utah 2021). "However, there is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing on one." *State v. Collier*, 2020 UT App 165, ¶ 12, 479 P.3d 351 (cleaned up). Because we conclude that Naranjo was not prejudiced by this alleged deficiency, we limit our analysis to the second prong. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). "The burden is on the defendant to demonstrate a reasonable probability that the outcome of his or her case would have been

different absent counsel's error. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350 (cleaned up).

¶48 Here, even if Counsel had requested a specific unanimity instruction as to which action or actions constituted Officer's signal to stop and which act or acts constituted Naranjo's failure to respond, we see no reasonable probability that this would have had an effect on the outcome.

¶49 Regarding the signal to stop, the activation of the lightbar was the most distinct and obvious signal. We see no reasonable probability that the members of the jury would have failed to agree that Naranjo knowingly received the signal to stop when Officer turned on the lightbar. It was a mostly empty parking lot, and Officer had already parked his patrol truck right in front of Naranjo. Even if Naranjo had not heard Officer's voice command or seen his initial hand signal, there is no chance that he would have missed the flashing lightbar. After all, lightbars are designed to be highly visible from a significant distance. That's why emergency vehicles have them. So even if jury members might have disagreed about whether Naranjo somehow missed all the other signals, we have no doubt that they would have agreed that Naranjo received at least this most obvious signal. There is no unanimity problem here because the lightbar—being the most conspicuous signal—subsumed all the less obvious signals that some members of the jury may have found sufficient. In other words, those jurors who were convinced that the more subtle signals were enough would, *a fortiori*, agree that the flashing lightbar constituted a signal to stop.

¶50 The same reasoning applies to Naranjo's failure to respond. The failure-to-stop statute simply requires that a driver who "receives a visual or audible signal from a law enforcement officer to bring the vehicle to a stop may not . . . attempt to flee or

elude a law enforcement officer by vehicle or other means." Utah Code § 41-6a-210(1)(a)(ii). Here, as we have just explained, there can be no unanimity problem on the signal to stop because the jurors would have agreed that the activation of the lightbar was sufficient. And yet, even after receiving this most obvious—indeed, almost impossible-to-miss—signal, Naranjo proceeded to drive away from Officer in an attempt to flee or elude him. We see no reasonable possibility that the jurors would have disagreed on this point.

¶51    Accordingly, Naranjo has failed to show prejudice by the lack of a specific unanimity instruction.

## CONCLUSION

¶52    Naranjo's sufficiency of the evidence challenges fail because there was evidence to support his convictions for failure to stop and possession of a controlled substance. His claim of ineffective assistance of counsel fails for lack of prejudice.

¶53    Affirmed.

———————