2026 UT App 91

## THE UTAH COURT OF APPEALS

ADOLFO MIRANDA,
Appellee,
*v.*
STATE OF UTAH,
Appellant.

Opinion
No. 20241305-CA
Filed June 11, 2026

Fourth District Court, Provo Department
The Honorable Kraig Powell
No. 190400474

Jeffrey S. Gray and Christopher D. Ballard,
Attorneys for Appellant

Ann M. Taliaferro and Debra M. Nelson,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

ORME, Judge:

¶1     A jury convicted Adolfo Miranda on six counts of aggravated sexual abuse of a child and three counts of rape of a child for acts perpetrated against his step-daughter, Beth.[1] Following an unsuccessful direct appeal, *see State v. Miranda* (*Miranda I*), 2017 UT App 203, 407 P.3d 1033, *cert. denied*, 417 P.3d 581 (Utah 2018), Miranda sought postconviction relief, arguing that his trial counsel was ineffective for not requesting a specific unanimity instruction and that his appellate counsel was ineffective for not raising that issue in his direct appeal. The State conceded deficient performance but argued that Miranda was not

_____

1. A pseudonym.

prejudiced by the lack of such an instruction. The postconviction court was persuaded by Miranda's argument and vacated Miranda's convictions. We reverse. Under the facts of this case, our confidence in the jury's verdict is not undermined. Accordingly, we vacate the postconviction court's order and reinstate Miranda's convictions.

## BACKGROUND[2]

### *The Abuse*

¶2      Beth's mother (Mother) and Miranda married in 2010, separated in 2012, and divorced in 2013. They then remarried in late 2013, but that second marriage lasted only 7 months. Shortly after Miranda and Mother separated for the second time, Beth disclosed to Mother that she did not want Miranda to come back, saying, "[H]e raped me." Beth's trial testimony regarding Miranda's years-long sexual abuse is recounted below.[3]

¶3      Miranda sexually abused Beth during the first marriage, beginning when Beth was around 9 years old and ending when she was around 12 years old. What began as "cuddling" and "spooning" in bed while watching television together turned into Miranda touching Beth inappropriately. The touching "got progressively worse" over time, beginning with Miranda touching Beth's buttocks and breasts (first over and then under her clothes), and later advancing to him touching the outside and then the inside of her vagina. Miranda also sometimes exposed his penis and told Beth to "grab it and . . . start moving it back and

---

2. "We review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Fraughton*, 2024 UT App 118, n.1, 556 P.3d 118 (quotation simplified).

3. Beth was 14 years old at the time of trial.

forth." While she did that, Miranda would insert his finger in her vagina. On one occasion, Miranda removed Beth's pants and "licked" her vagina, but she pushed him away. This sexual abuse that took place under the guise of watching television in bed together occurred on a nearly daily basis in an upstairs bedroom and later, after the basement was finished, in a basement bedroom.

¶4     During the summers, Miranda took Beth to work with him at a Provo mini mall, where he also inappropriately touched her. During his breaks when no one was around, Miranda would have Beth come into his office, sit on his lap, and "pull" his exposed penis "up and down" while he touched her vagina. Beth stated that this occurred around five times but possibly more. Afterwards, Miranda would give Beth money to spend at a nearby dollar store. On one occasion, Miranda took Beth to the mini mall at night, after it had closed. Miranda found an area outside the view of the security cameras where he touched Beth's vagina while she was standing and made her stroke his penis.

¶5     After the mini mall closed down, Miranda took Beth to his job at an arcade in Orem. Beth recounted an instance in a co-worker's office when Miranda moved a camera to the side, had Beth sit on his lap, and abused her in the same manner as he did in his office at the mini mall: he touched her vagina while having her stroke his penis.

¶6     Beth also testified that Miranda raped her "five or six" times, with the first instance occurring when she was 11 or 12. During this first instance, Miranda told Beth to come "cuddle" in the basement bedroom. There, he bent her over the side of the bed, pulled down her pants, and inserted his penis into her vagina. Thereafter, Miranda raped Beth in that same manner in the basement bedroom. Beth testified that one of those instances occurred when Mother "gave birth to [her] little brother." Beth stated, "[Mother] was in the hospital while I was home with [Miranda], and I slept with him on his bed."

¶7 Beth testified that Miranda also once raped her at the house of a close friend of his who also worked at the arcade. That day, Miranda and Beth left the arcade to retrieve something from the friend's house, where they found themselves alone. Miranda laid Beth on her back on the friend's bed, removed her pants, and raped her. Afterward, they returned to the arcade.

¶8 Beth also recounted an instance that took place after Miranda and Mother separated for the first time. Miranda came over to the house to visit the then-one-year-old son he shared with Mother. While sitting on the couch, Miranda exposed his penis to Beth. Beth pulled down her own pants and was about to "sit on it" when she suddenly "got really nervous" and told Miranda that she "didn't feel comfortable doing this." Miranda then "put his penis back in his pants," and Beth pulled up her own pants and left the room. The sexual abuse did not resume when Miranda moved back into the house during the second marriage.

*Criminal Proceedings and Direct Appeal*

¶9 In 2014, following Beth's disclosure of the sexual abuse to Mother and the ensuing police investigation, the State charged Miranda with six counts of aggravated sexual abuse of a child and three counts of rape of a child, all first-degree felonies. A three-day jury trial was held in 2015. Beth testified as outlined above. Mother also testified.

¶10 Miranda took the stand in his own defense. He categorically denied ever raping or otherwise sexually abusing Beth. He asserted that he and Mother were engaged in contentious divorce proceedings involving custody of their shared son, and he posited that Mother had coached Beth to lie about the sexual abuse to obtain a custody advantage. He also suggested that Beth had fabricated the allegations in retaliation for him "not wanting to come back" after the second separation.

¶11 At the close of the defense case, the trial court instructed the jury. While the jury was generally informed that it must "consider each charge separately" and that its verdict on each

charge must be unanimous, the instructions failed to link a specific act to each charge or otherwise clarify that the jurors must agree on the same underlying act for each conviction. The jury was further instructed that "[e]ach act of sexual touching constitutes a separate offense, even if the two acts arose out of a single incident of contact."

¶12    During closing argument, both sides agreed that the case hinged on credibility. The prosecutor told the jury that "this really is a contest of truth" between Beth's allegations and Miranda's denial. He then proceeded to argue at length that the State's witnesses, including Beth and Mother, were more credible than the defense witnesses, particularly Miranda.[4] Miranda's trial counsel similarly told the jury, "[O]ne very difficult question that you need to answer . . . is who's telling the truth." Trial counsel then put forward two possible reasons why Beth would have fabricated the allegations: she "want[ed] their family to be together again"[5] and the allegations advantaged Mother in the ongoing divorce proceedings.

¶13    During closing argument, the prosecutor also addressed the six counts of aggravated sexual abuse of a child, summarizing Beth's testimony that Miranda touched her buttocks, vagina, and breasts; "inserted his finger in her vagina"; and made her

---

4. In addition to Miranda, the defense called as witnesses a former operator of a stand at the mini mall, which was located near Miranda's office, as well as the stand operator's daughter who played with Beth almost every day at the mini mall. The stand operator testified that she never witnessed Miranda inappropriately touch Beth, and the daughter testified that Beth never disclosed any sexual abuse to her.

5. It is not entirely clear how falsifying claims of sexual abuse against Miranda would increase the chances of the family reuniting. Trial counsel may have been referencing Miranda's suggestion that the allegations were retaliation for him "not wanting to come back."

"masturbate him" and "take indecent liberties with him." The prosecutor reiterated the jury instruction that "each act of sexual touching constitutes a separate offense whether that happened in one incident or over multiple incidents." The prosecutor provided an example, stating that if the jury found that Miranda "touched her buttocks and her vagina in one incident of abuse, that can be two counts." And pointing to Beth's allegations that Miranda "touched her so many times that she can't count them," the prosecutor indicated that the six counts were "a representative example of . . . those multiple times" and that the jury must find that there are "at least six occasions when [Miranda] did this." But the prosecutor cautioned that the jury "must consider each one of those separately in light of the evidence and not say well, he did it once, he must have done it six" times. The prosecutor further explained,

> There is plenty of evidence to support that conclusion. There's plenty of evidence to show that he touched her more than once at their home . . . so that would be two counts. . . . [T]here's plenty of evidence that he touched her more than once at the mini mall in Provo. That's two more counts. Then finally that he touched her more than once at the [arcade], and that would be the fifth and sixth counts.

¶14 As for the three counts of rape of a child, the prosecutor told the jury that the evidence showed that Miranda raped Beth "five to six times"—"more than once in the . . . basement bedroom" and once at the house of Miranda's friend.

¶15 The jury returned guilty verdicts on all nine counts after less than 90 minutes of deliberation. Miranda subsequently moved for a new trial based on several evidentiary claims. The trial court denied that motion, stating that Beth "gave direct evidence by testifying in detail and credibly," and it further found that her testimony "was impressive and resolute."

¶16 Miranda then pursued an unsuccessful direct appeal of his convictions. *See Miranda I*, 2017 UT App 203, ¶ 52, 407 P.3d 1033, *cert. denied*, 417 P.3d 581 (Utah 2018). In that appeal, Miranda's appellate counsel did not argue that the jury instructions failed to properly instruct the jury on the unanimity requirement. *See id.* ¶¶ 23–25.

*Postconviction Proceedings*

¶17 Following his direct appeal, Miranda filed a pro se petition for postconviction relief. Several years later, after obtaining postconviction counsel, Miranda filed an amended petition arguing, among other things, that his trial and appellate counsel were ineffective for not requesting a specific unanimity jury instruction or raising that issue on appeal, respectively. At the ensuing hearing, the State conceded that both trial and appellate counsel's performance was deficient, leaving the postconviction court to determine only whether the deficient performance prejudiced Miranda.[6]

¶18 The postconviction court concluded that Miranda had demonstrated prejudice. Citing *State v. Chadwick*, 2024 UT 34, 554 P.3d 1098, the court held that "there are certain circumstances that inherently undermine confidence in the unanimity of a verdict," such as multiple-acts cases in which "the counts charged are identical and the counts are not linked to specific underlying conduct." *See id.* ¶ 40. The court further concluded that "[n]ot only did the general unanimity instructions in this case leave room for confusion, but statements made by the prosecution during closing argument at trial suggested that different members of the jury had the option to pick and choose from the various alleged incidents, in violation of the unanimous verdict requirement." And the court stated that as a result of this, the jury was "encouraged . . . to gloss over the specific facts required to unanimously establish each element of each separate crime, thereby undermining confidence

---

6. Different judges presided over the postconviction proceedings and the trial.

in the verdict." Thus, the court "conclude[d] by a preponderance of the evidence that there is a reasonable probability that, but for these errors, the result of the proceeding would have been different."

¶19 The court accordingly vacated Miranda's convictions and ordered a new trial. The State appeals.

## ISSUE AND STANDARD OF REVIEW

¶20 The State argues that the postconviction court erred in concluding that Miranda was prejudiced by the omission of a specific unanimity jury instruction. "On appeal from a ruling on a petition for post-conviction relief, we review the post-conviction court's legal conclusions for correctness and its factual findings for clear error." *Carter v. State*, 2025 UT 13, ¶ 67, 570 P.3d 315 (quotation simplified). *See also State v. Torres-Orellana*, 2024 UT 46, ¶ 66, 562 P.3d 706 (holding that a lower court's "application of the *Strickland* standard, including its prejudice prong, is reviewed for correctness").

## ANALYSIS

¶21 The Utah Constitution mandates that jury verdicts in criminal cases "be unanimous." Utah Const. art. I, § 10. More precisely, the verdict must be unanimous "as to a specific crime" and "on all elements of a criminal charge." *State v. Hummel*, 2017 UT 19, ¶¶ 28–29, 393 P.3d 314 (quotation simplified). Put differently, a jury may not render "a generic 'guilty' verdict that does not differentiate among various charges" based merely on a unanimous finding "that a defendant is guilty *of a crime*." *Id.* ¶ 26 (emphasis in original; quotation otherwise simplified). To ensure unanimity in cases where the evidence details more criminal acts than the number of counts charged, "the jury instructions must either (1) link an alleged criminal act to a charge or (2) inform the jury that it must unanimously agree that the same alleged

criminal act has been proven beyond a reasonable doubt." *State v. Mike*, 2025 UT App 163, ¶ 40, 581 P.3d 590 (quotation simplified).

¶22 The postconviction court in this case ruled that the failure to ensure that the jury was properly instructed on the unanimity requirements constituted ineffective assistance by both trial and appellate counsel. *See* Utah Code Ann. § 78B-9-104(1)(d) (LexisNexis Supp. 2025) (listing ineffective assistance of counsel as a ground for which criminal defendants may obtain postconviction relief from their conviction or sentence); *id.* § 78B-9-106(3)(a) (2022) ("[A] petitioner may be eligible for relief on a basis that the ground could have been but was not raised in the trial court, at trial, or on appeal, if the failure to raise that ground was due to ineffective assistance of counsel."). Ineffective assistance of counsel occurs when (1) defense "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See also* Utah Code Ann. § 78B-9-104(2)(a) ("The court may not grant relief from a conviction or sentence unless in light of the facts proved in the postconviction proceeding, viewed with the evidence and facts introduced at trial or during sentencing . . . the petitioner establishes that there would be a reasonable likelihood of a more favorable outcome[.]"). Because the State concedes that trial and prior appellate counsel performed deficiently, only the prejudice prong is at issue here.

¶23 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Accordingly, the defendant bears the burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In other words, "our prejudice analysis asks whether we remain confident that the verdict would be the same" absent the deficient performance. *State v. McNeil*, 2016 UT 3, ¶ 31, 365 P.3d 699. Given the facts of this case, we are not persuaded

that it is reasonably likely that the outcome of the trial would have been different if the jury had been properly instructed on unanimity.

¶24   As an initial matter, the postconviction court erred in presuming prejudice. The court's reliance on *State v. Chadwick*, 2024 UT 34, 554 P.3d 1098, in support of its conclusion that multiple-acts cases in which the number of alleged criminal acts exceeds the number of corresponding charges "inherently undermine confidence in the unanimity of a verdict" is misplaced. In *Chadwick*, our Supreme Court addressed the prejudice standard for *preserved* unanimity issues, concluding that—much like other preserved constitutional errors—the absence of a specific unanimity instruction carries a rebuttable presumption of prejudice. *See id.* ¶¶ 30, 57. But in cases of *unpreserved* unanimity issues, like the case here, the defendant bears the burden of satisfying the *Strickland* prejudice standard. *See id.* ¶¶ 49, 54. *See also State v. Baugh*, 2024 UT 33, ¶ 42, 556 P.3d 35 (applying the *Strickland* prejudice standard to an ineffective assistance claim challenging a lack of a specific unanimity instruction); *State v. Bond*, 2015 UT 88, ¶¶ 43, 46–47, 361 P.3d 104 (stating that "even federal constitutional errors so serious as to be deemed structural are subject to preservation requirements" and a "harmlessness analysis"). And applying the *Strickland* prejudice standard, this court has held in several cases that the defendant was not prejudiced by the lack of a proper unanimity instruction. *See, e.g., Mike*, 2025 UT App 163, ¶ 43; *State v. Farmer*, 2025 UT App 57, ¶ 72, 569 P.3d 267, *cert. denied*, 574 P.3d 522 (Utah 2025); *State v. Naranjo*, 2023 UT App 131, ¶ 49, 538 P.3d 1278; *State v. Mottaghian*, 2022 UT App 8, ¶ 72, 504 P.3d 773, *cert. denied*, 525 P.3d 1256 (Utah 2022). We likewise conclude so here.

¶25   The jury was instructed "to consider each charge separately." Turning first to the three rape-of-a-child counts, the prosecutor told the jury during closing argument that the evidence showed that Miranda raped Beth "five to six times"—once at the house of Miranda's friend and the remaining times in the basement bedroom of the family home. Given that the jury

convicted Miranda on all three counts, all jurors necessarily found beyond a reasonable doubt that Miranda raped Beth in the basement bedroom at least twice. Given Beth's testimony that Miranda raped her "five or six" times, with one of those times being at the friend's house, four to five of those instances occurred in the basement bedroom. And we see no basis in the evidence from which to conclude that any juror would have believed that Miranda raped Beth in the basement only twice, but not the additional two or three times to which she testified. *Cf. Mike*, 2025 UT App 163, ¶ 43 ("Given the jury's finding that [the defendant] assaulted [his sister] by repeatedly punching her, the jury certainly unanimously agreed on that same underlying conduct when it convicted him on the intoxication charge."). Indeed, in denying Miranda's earlier motion for a new trial, the judge who presided over the trial stated that Beth testified "in detail and credibly" about the sexual abuse and that her testimony "was impressive and resolute."[7] Accordingly, we see no reasonable probability that the jury would not have unanimously agreed that

---

7. Miranda asserts that Beth's account that Miranda raped her "at the very time [Mother] was in the hospital giving birth" was "highly incredible." But Beth's testimony did not go so far. Beth stated, "I remember one time that she gave birth to my little brother . . . . She was in the hospital while I was home with [Miranda], and I slept with him on his bed[.]" We do not take this statement to mean that the rape occurred while Mother was actively giving birth. Rather, Beth simply stated that the rape occurred while Mother was in the hospital. It makes sense that Miranda would have left the hospital to care for any children who remained at home while Mother was recuperating with the baby.

Miranda also asserts that "Beth made several completely new accusations for the first time at trial," including her allegation of rape while Mother was at the hospital. This does not alter our analysis. Even if certain jurors disregarded that specific allegation, we have no reason to believe that the jury rejected Beth's other three or four allegations of rape that occurred in the basement—particularly when it necessarily credited at least two of those allegations.

Miranda raped Beth for a third time in the basement bedroom after already finding that it occurred twice.

¶26 We are similarly not persuaded that Miranda was prejudiced with respect to the six counts of aggravated sexual abuse of a child. The postconviction court took issue with the prosecutor's closing argument, stating that the prosecutor "suggested that different members of the jury had the option to pick and choose from the various alleged incidents, in violation of the unanimous verdict requirement." Specifically, the court pointed to the following excerpt from the prosecutor's closing argument:

> [Beth] testified that [Miranda] touched her so many times that she can't count them. These six charges of aggravated sexual abuse of a child related to that sexual touching are a representative example of . . . those multiple times. You must consider each one of those separately in light of the evidence and not say well, he did it once, he must have done it six [times]. . . . [Y]ou must believe that there are six—at least six occasions when [Miranda] did this.
>
> There is plenty of evidence to support that conclusion. There's plenty of evidence to show that he touched her more than once at their home . . . . so that would be two counts. . . . [T]here's plenty of evidence that he touched her more than once at the mini mall in Provo. That's two more counts. Then finally that he touched her more than once at the [arcade], and that would be the fifth and sixth counts.

The court held that the lack of a specific unanimity instruction, combined with the prosecutor's closing argument, "encouraged the jurors to gloss over the specific facts required to unanimously

establish each element of each separate crime, thereby undermining confidence in the verdict." We disagree.

¶27    The State may sometimes alleviate the prejudice resulting from jury unanimity problems during closing argument by "clearly identifying for the jury which factual circumstance formed the basis for the charge." *State v. Macleod*, 2024 UT App 32, ¶ 66, 546 P.3d 366 (quotation simplified), *cert. denied*, 558 P.3d 87 (Utah 2024). We read the prosecutor's closing argument as first instructing the jury that it must separately consider each of the six charges and that it could not convict Miranda of all six charges based on a finding that "he did it once." Second, the prosecutor linked each of the six charges with the location that the touching was alleged to have occurred: counts one and two occurred at the house, counts three and four at the mini mall, and counts five and six at the arcade.

¶28    Given this clarification, our confidence in the jury verdict remains strong. Although the prosecutor did not further link a specific touch to each charge, under the facts of this case, the geographical link was sufficient to alleviate any potential prejudice. We are not convinced that a jury that was unanimously persuaded by Beth's testimony that Miranda inappropriately touched her at each of three locations would have disagreed on points of Beth's account regarding what kind of touching occurred at each place—particularly in light of the trial court's assessment that Beth offered detailed, credible, impressive, and resolute testimony. Specifically, on the record here, we remain confident that had the jurors been properly instructed that they needed to agree on specific acts of touching to convict on the sexual abuse counts, they would have reached a consensus. In other words, on this record we see it as highly unlikely that the jury would not have agreed on the touching that occurred—and they may have all agreed that all the claimed touching was proven—and thus would have convicted on all counts.

¶29    Lastly, we address Miranda's contention that he was prejudiced by the lack of a specific unanimity instruction because

it prevented his trial counsel from focusing on assailing specific alleged acts. As explained above, *see supra* ¶ 21, although the unanimity requirement is certainly satisfied by having the jury instructions specifically "link an alleged criminal act to a charge," the requirement is also satisfied if the instructions "inform the jury that it must unanimously agree that the same alleged criminal act has been proven beyond a reasonable doubt." *Mike*, 2025 UT App 163, ¶ 40 (quotation simplified). The second option would have been equally restrictive, still preventing trial counsel from focusing the defense on specific allegations. And indeed, in cases involving prolonged sexual abuse such as this one, we can readily envision the prosecution choosing the latter approach instead of limiting its case to specific instances of abuse. For this reason, this claim of prejudice likewise fails.

## CONCLUSION

¶30 Based on the facts of this case, we are not persuaded that there is a reasonable likelihood that the outcome of Miranda's trial would have been different if the jury had been properly instructed on the unanimity requirement. Because Miranda has not shown he was prejudiced, his ineffective assistance claims fail, and we reverse the postconviction court's order for a new trial and reinstate Miranda's convictions.

———